The SUCHER PACKING CO., Appellant,

v.

MANUFACTURERS CASUALTY INSUR-
ANCE COMPANY, Appellee.

No. 12815.

United States Court of Appeals
Sixth Circuit.

June 25, 1957.

Jerome Goldman, Cincinnati, Ohio, for appellant.

William G. Pickrel and William H. Selva, Dayton, Ohio. Pickrel, Schaeffer & Ebeling, Dayton, Ohio, of counsel, for appellee.

Before McALLISTER, MILLER and STEWART, Circuit Judges.

## McALLISTER, Circuit Judge.

The Sucher Packing Company brought suit against appellee insurance company to recover on a policy, indemnifying against loss resulting from larceny and theft by employees and any inventory shortage which the assured should conclusively prove to have been caused by dishonesty or fraud on the part of any of its employees. The case was tried before a jury, which brought in a special verdict. Appellant had sought a judgment in the amount of $146,370.57; the jury awarded $83.00.

On appeal, The Sucher Packing Company makes numerous claims of error, contending that the trial judge erred in excluding from the consideration of the jury specified records of appellant company; in restricting recovery of damages to certain losses; in submitting a form of special verdict to the jury; in directing a reading to the jury by the court stenographer, of the entire testimony of

appellee's principal witness, as embodying a substantial part of appellant's claim; and in various rulings upon the admission or exclusion of testimony.

It is submitted by appellant that when The Sucher Packing Company was acquired in 1945 by a group of investors headed by Arthur Beerman, it was a successful business, and continued its profitable operations during the first part of that year, but, thereafter, began to suffer large and unaccountable losses, which continued until 1950. Appellant claims that it used many methods of attempting to ascertain the reason for such losses, including the installation of modern business record machines; the checking on weights of meat as it was processed in one place in the plant, and moved to another; blocking of unnecessary openings within the plant, and from the plant to the exterior; hiring extra guards; and employing various squads of detectives. On certain occasions, employees were found pilfering meat and were immediately discharged, but these instances were not considered of any moment.

The great losses, however, according to appellant, still continued until, on September 11, 1950, Superintendent McConkey noticed a new barrel being used on the trash truck, which was backed up to the loading dock. As only old barrels were used for trash, this incident aroused Mr. McConkey's suspicions, with the result that he inspected the contents of the barrel, and, when he looked into it, found smoked hams under a layer of trash, and also discovered fresh shoulder butts concealed in papers on the floor of the truck. The trash truck driver, William Harris, was then held for investigation; and, upon questioning, he implicated four other employees, James Jackson, Robert Maiden, Helen Hurt and Willis Early. William Harris and James Jackson were arrested, pleaded guilty to grand larceny, and were sentenced to terms of imprisonment. As to Robert Maiden, Helen Hurt and Willie Early, the jury in the instant case absolved them from any acts of dishonesty,

and found that no losses to appellant had resulted from any action on their part, acting either alone or in collusion with anyone else. The jury further found that William Harris and James Jackson, together, had been guilty of stealing hams, shoulders, and bacon from appellant. A most important finding by the jury in its special verdict was that there was insufficient evidence to determine any estimate of the number of pounds of hams, shoulders and bacon that had been stolen by Harris and Jackson. The method by which the jury arrived at a verdict of $83.00 in favor of appellant was as a result of finding, on the admission of the insurance company, that appellant had sustained a loss of $291.00 as a result of the thefts of Harris and Jackson, and that appellant had withheld wages owing in the amount of $208.-00. Subtracting the wages withheld from the losses suffered by appellant, gave the amount of the verdict returned.

 Harris, who confessed to the theft testified as appellant's witness and stated that he had been stealing from appellant for two years. It was appellee's contention that appellant suffered no large losses as a result of thefts by employees, and that Harris had been employed for only a comparatively brief period. Accordingly, on cross-examination, Harris was confronted with a statement that he had made to a detective at the time of his arrest, in which he had confessed that James Jackson "had got him to stealing hams" about three weeks before his arrest. To explain the conflict in his testimony that he had been stealing from appellant for two years, with the prior statement made to the detective that he had been stealing for three weeks, Harris stated that he meant that he had been hauling for only three weeks, instead of having been stealing for only that length of time. It was for the jury, however, to determine from the evidence whether Harris had been stealing from appellant for two years or for only three weeks. In this regard it is to be noted that Harris had testified that Helen Hurt, Willie Early and Robert Maiden were

"involved" in the stealing. The jury, as mentioned, found these three to be innocent of any dishonest action; and the conclusion is inescapable that the jury attached no value to the testimony of Harris and disbelieved practically all of his testimony with regard to the time during which he had been engaged in stealing from appellant, the amount of meat that had been taken by him, and the persons he testified were involved with him.

The complaint filed by appellant, and the numerous amended complaints subsequently filed, embodying its changing contentions during the trial of the case, foreshadow the uncertainties of appellant's claims and proofs. On September 2, 1952, the complaint was filed; thereafter, an amended complaint, and a second amended complaint were filed. The second amended complaint was amended during the trial, and thereafter, again amended during the last day of the trial. The amended complaints withdrew claims of losses by theft of beef and veal from $9,620.91 to no loss whatever; of loss by theft of sausage from $12,546.74 to $10,392.74—and subsequently the claim for loss from sausage, was entirely withdrawn; and, finally, complainant made an allowance for meat consumed by its employees in its cafeteria, which had previously been claimed as a loss by theft. Copies of the same exhibits, twelve in number, were given by appellant to the members of the jury, in order that they could follow the testimony. These exhibits were found to contain such errors that the copies were withdrawn and collected from the jury, and replaced by other exhibits in the hands of the jury, which were subsequently found to contain such errors, while the items were being explained to the jury, that they were also withdrawn and collected from the jury, and others submitted in their place. We refer to the foregoing as characteristic of errors and uncertainties in appellant's changing claims and proofs that took place during the trial.

It may here be remarked that appellant could not prove what part of its claimed loss took place in 1948, or what part, in 1949. While it claimed that a loss amounting to $146,370.57 was due to theft, it could give no idea when, during this entire period, the alleged thefts occurred.

Appellant had first claimed in its complaint damages as a result of thefts of beef, veal, sausage, smoked pork and fresh pork. As to beef and veal, counsel admitted in open court that appellant could not prove such losses by theft. So beef and veal were withdrawn from the claim.

Harris testified that pork loins and sausage had been stolen by others without any certainty in amount or specification of names, but he stated that he never took anything but hams, shoulders and bacon. As a result of his testimony, counsel for appellant stated to the court: "Sausage may be eliminated as the testimony of Harris with respect to sausage is too indefinite. So the case is now restricted and confined to fresh pork and smoked pork."

Moreover, appellant, in addition to claiming that the insurance company should, according to the terms of the policy, indemnify it against loss "through theft, larceny, embezzlement, misappropriation, wrongful abstraction or fraudulent act or acts committed anywhere, by any of the employees, acting alone or in collusion with others," also claimed indemnity for "that part of any inventory shortage which the assured shall conclusively prove to have been caused by dishonesty or fraud on the part of any of its employees."

However, the proof of inventory shortage, although it appears to have been the principal part of appellant's case, was so deficient, contradictory, and worthless from the standpoint of evidence of conclusive proof of "inventory shortages caused by dishonesty of employees," that appellant, in its requested instructions to charge the jury, stated that "plaintiff is not claiming an in-

ventory shortage. * * * Under such circumstances, the portions of the policy with respect to the proof required of inventory shortages are not applicable."

The policy of indemnity insurance, as heretofore remarked, limited the insurance company's liability to $20,000 for each employee and to $20,000 for losses caused by unidentifiable employees, as well as inventory shortage conclusively proved to have been caused by dishonesty on the part of any of the employees. Appellant asked a judgment of $146,370.57, claiming, apparently, $20,000 for thefts of five employees, and the balance for thefts of unidentifiable employees and inventory shortage, caused by theft. However, at the close of the proofs, appellant submitted nine requests for special instruction to the jury, and, although it requested, in certain of them, instructions as to liability, specifically, for losses caused by the dishonesty of identifiable employees, in none of them did it request the court to charge on the liability of appellee for losses caused by the dishonesty of unidentifiable employees.

 Before argument, the trial court stated that it would withdraw from the consideration of the jury appellant's claim for damages for losses sustained by dishonesty of unidentifiable employees. No objection to this action of the court was made by appellant, at that time, or after the charge to the jury, as is required if the question is to be saved for review. It is too late on appeal to complain of the action of the trial court in this regard. Moreover, it would appear from his argument to the jury that counsel had, without objection, at least implicitly, concurred in the court's withdrawal of the issue. At no time was anything said that would indicate counsel was going to rely upon the action of the court, in withdrawing the issue of losses sustained by dishonesty of unidentifiable employees, as reversible error. In his argument to the jury, counsel stated that "We are limited to only those five employees who have been identified, and I think Early was in the

ring only a short period, and all we are entitled to is $20,000 for each of the employees who acted alone or in collusion with others, so that our maximum recovery cannot exceed $100,000 under the terms of the policy, even though our losses may have been considerably greater. But for the ring, four employees, during the period that they acted, we are entitled to recover at least the $80,000, and I submit, frankly, I don't believe that while Willie Early was a member of the ring, there was as much as $20,000 taken. He was a member for too short a period." This was a drop of $66,000 from the claim of $146,000 upon which appellant insisted at the trial until the arguments. The general nature of the uncertain method by which appellant's claim was sought to be proved, is evident from the argument as to Willie Early. Counsel did not think Early was a member of the ring, while as much as $20,000 worth of meat was stolen; but we are not told whether appellant's claim, as to Early, amounted to $1.00 or some amount approximating $20,000.

Appellant now claims that Harris stated specifically that he saw other unidentified employees take pork loins and sausage, and refers to this testimony as proof of theft by "unidentifiable employees," in the language of the insurance policy. But he only testified that he saw other employees take pork loins—not unidentifiable employees; and even this is indefinite, with no names, nor amounts taken. With this fragment of evidence as to unidentifiable employees, it would be easy to understand appellant's abandonment of that phase of its claim.

The foregoing, then, discloses that appellant first withdrew all claims for losses by theft of beef and veal, because it could not prove them. It then withdrew all claim for losses by theft of sausage, because it could not prove them. It then, in effect, withdrew all claims for losses by theft caused by unidentifiable employees as a class, because it could not prove them. It finally withdrew all claims for inventory shortage

caused by dishonesty of employees, because it could not prove them. Its final claim was limited to losses allegedly caused by the theft of meat to the amount of $20,000 each, by Helen Hurt, Robert Maiden, Willie Early, William Harris and James Jackson.

The jury found in its special verdict, as above mentioned, that Helen Hurt, Robert Maiden and Willie Early had not stolen anything. As to William Harris and James Jackson, the jury found that while they had stolen pork meats, there was insufficient evidence to enable the members of the jury to make any finding as to the number or approximate number of pounds of meat stolen by them; and as to James Jackson, the jury found that his theft had occurred September 11, 1950; and, as to Harris, that his thefts had occurred between July 26, 1950 and September 11, 1950—a period of between six and seven weeks. It is impossible that these two employees, during such a short period, could have stolen more than a small amount of meat.

█ Upon an examination of the record, it is clear that the verdict of the jury was justified by the evidence. The jury obviously refused to give any credence whatever to the testimony of William Harris, except where it was not in dispute; and, as the trial court charged, the jury is the sole judge of the credibility of witnesses.

One of the chief claims of error made by appellant is that the district court excluded from the consideration of the jury the records of appellant which it had introduced to show an inventory shortage. It was admitted by appellant, at the close of the proofs, that it was not claiming an inventory shortage, "caused," in the language of the insurance policy, "by dishonesty or fraud on the part of any of the employees." In keeping with appellant's proposed instruction setting forth that it was not claiming an inventory shortage, the trial court gave the following special instructions to the jury:

"[In] your consideration of this case, and endeavoring to arrive at a conclusion, you are not to consider the evidence of an inventory shortage.

"I realize we have been here a number of days hearing evidence on the question of inventory shortage, and it is necessary that the Court hear all the evidence. It becomes necessary for the Court to determine as a matter of law, whether that presents a factual question which may be considered by the Jury.

"So, the Court has determined, as I say, that in arriving at your verdict, you will not consider this evidence of inventory shortage. In other words, it cannot be used by you as any measure of determining any loss to the plaintiff."

Accordingly, exhibits taken from appellant's records showing the disposition of product through its plant, the detailed daily and weekly figures from three large packing cases of primary data, folders of Weekly Products Analysis Sheets, stock records, and the various computations made from the foregoing, as well as the exhibits offered on the same subject, were withheld and not submitted to the jury. This is claimed to be reversible error.

██ When the trial court instructed the jury that they were not to consider the question of inventory shortage in determining losses of appellant, this seemed to be in agreement with the recital in appellant's proposed instruction that it was not claiming an inventory shortage. Appellant now says, however, that the court's instruction on this point constituted reversible error because it should have instructed the jury that it could consider the claimed inventory shortage, as corroborating direct evidence of appellant's loss by theft, or as stated in appellant's reply brief, "to assist [the jury] in determining the amount of appellant's loss." If the district court's instruction, in this regard, was erroneous, it certainly was not plain error, and appellant was obliged, in order to save the question for review, to ex-

cept or object to it, in order to call the court's attention to any misstatement or oversight and to give an opportunity for correction. Counsel for appellant did except to the instruction, but in the following language: "Also, take exception at this time to the exclusion of the matter of the book figures which was the result of your Honor's earlier decision; in your instructions, it was repeated, they were not to be considered in describing the inventory shortage." This, obviously, was not an objection or exception calling the court's attention to the claim now made by appellant that the books should have been admitted to corroborate proof of theft. The exception was that the books "should not be considered in describing inventory shortage." Appellant had informed the court in its proposed instruction that it was not basing its case on the theory of inventory shortage; and all that the court told the jury was that they could not consider evidence of inventory shortages in determining any loss to appellant. It would have been improper, after such an instruction, for the court to have charged the jury that it could consider the claimed inventory shortage in order to assist it in determining the amount of appellant's loss, as that would have permitted the jury to consider the inventory shortage as proof of loss to appellant by reason of the theft of employees; and appellant agrees that such proof, under the indemnity policy, must constitute "conclusive proof" of such dishonesty, which it conceded that it failed to adduce.

■ Appellant further submits that the district court at the outset of the trial, specifically stated that "exceptions are not necessary," thus seeking to justify any failure to except to the charge to the jury. The court's ruling, however, that exceptions were not necessary, was made with regard to exceptions during the progress of the trial. Formerly, counsel were obliged not only to object to such matters as rulings of the court on the admissibility, or nonadmissibility of evidence, but it was also required to except to the rulings of the court during the trial, in order to save the question for review. Such requirement has been discontinued. Rule 46 of the Federal Rules of Civil Procedure, 28 U.S.C.A. However, it is still necessary to object or except to instructions of the court to the jury. Rule 51 of the Federal Rules of Civil Procedure. Thus it is seen that the remark of the court, that no exceptions were necessary, related to rulings during the trial, and had no application to the requirement that a party must except or object to the court's instructions to the jury in order to save the question for review. We fail to see where the court was in error in its instructions, or that any exception was made by counsel for appellant that would call the present claimed error to the court's attention; and we find no merit in appellant's contention in this regard.

■ Even if appellant had requested the court to charge that its records showing inventory shortage could be considered by the jury as corroborating the direct evidence of appellant's loss by theft—and had duly excepted to the failure of the court so to instruct—it is doubtful that the court's refusal to give such requested instruction could be considered error under the circumstances of this case. Plaintiff's proofs of inventory shortage, and the records and computations made by them for the purpose of such proof, are uncertain and deficient. As an instance, shrinkage, or loss of the weight of meat, was one of the principal items with which the case was concerned. As testified by the superintendent of appellant company, " 'shrink' is one of the bugaboos of the meat industry. It depends on many factors. The conditions existing in a particular plant affect shrink, and among these factors are temperature, air-circulation, relative humidity in the cooler, position of vat covering, frequency with which the door of the cooler is opened and closed, removal or addition of hot carcasses and the type of breed of animal—whether lean or fat." Records for humidity and temperatures of appellant's plant during the critical years were missing, and

apparently, no record was ever made as a result of any actual test of shrink at the plant.

Furthermore, when the accountant for appellee asked appellant company for the general ledger, general journal, journal vouchers, audit work papers, records covering temperature, humidity, changes of air, and circulation, they were not available. Appellee's accountant further testified that the product analysis sheets, upon which appellant so completely relied, contained round numbers and approximation of weights; that "product transfers-out" in round numbers, from fresh pork, affected the balance remaining, or supposed to be remaining, in fresh pork; that if the one item was wrong, the other would be wrong; that the use of round numbers was incorrect because it was not an exact weight and the result would be that the amount of fresh pork remaining on hand would not be exact and accurate; that the product analysis sheets showed no allowance for any shrink; that the several million pounds of meat were held in inventory, during the critical years, for at least two days, in which there should have been additional shrink computed, but that none of these items were reflected on the product analysis sheets; that in none of the papers or records submitted by appellant was there any statement by any officials, employees, or counsel of appellant company, as to any loss by shrinkage, mistake, or theft, except in connection with the original chilling shrink; that lard appeared nowhere on appellant's exhibits; and that, as an accountant, it was impossible for him to take the records and to trace out and say what should have been on hand.

There are multitudinous errors and uncertainties in appellant's records and its proofs of inventory shortages. As an instance, for the week ending October 1, 1948, there was a shortage of pork of 18,245 pounds, which was unexplained. It was claimed that if an error was made, it would straighten itself out in the following week, but, on October 8, 1948, the next week, the shortage was 14,313 pounds, which, the vice-president of the appellant company said, "no doubt, caused a lot of concern." For the week ending June 11, 1949 there was a shortage of 16,555 pounds of meat, which no one could explain. It was not claimed that more than 8 tons of meat were stolen during that week. For the week ending July 2, 1949, there was a gain of meat, on the records, in the amount of 6,000 pounds, although nobody had brought that amount of meat to appellant's plant. On October 22, 1949 there was a shortage of 1,811 pounds of sausage, but the plant officials did not think that any of the employees had stolen it. When appellant's claim was first submitted to the jury, appellant had forgotten to deduct from its claim of stolen meat, a large amount that had been supplied, and consumed by its employees, in appellant's cafeteria. As to the claim that when a shortage appeared on the books, it indicated a theft, on one of the inventory statements it appeared that there had been a shortage of 5,544 pounds of offal in a certain period. Yet no one claimed that anyone was stealing offal. In view of appellant's claim that Harris, Jackson, and "the ring" were responsible for the great losses suffered by appellant as a result of their thefts, a remarkable circumstance is seen in the shortages after Harris and Jackson were arrested, and the others dismissed. When it was then assumed that the cause of shortages had been found, and those responsible arrested or discharged, it appears from the work-sheets of the certified public accountant, employed by appellant to determine the extent of unexplained losses, that on September 16, 1950, the week after Harris had been arrested, the shortage for that week was 11,000 pounds. On September 25 there appeared a shortage of 3,700 pounds and on September 30, 6,600 pounds—none of which could be attributed to thefts by Harris, Jackson and "the ring." It seems significant that Mr. Hadeler, the accountant employed by appellant to determine the extent of the unexplained losses, testified that, as an example, an item of shrinkage of

4,800 pounds in a certain week could come either from errors in transfer, or in taking the inventory; in additional shrinkage because the meat had stayed too long in storage, or through spoilage; or, finally, from theft.

In spite of all the complications in the proofs, the trial court summed the case up tersely and clearly when, in a colloquy with appellant's counsel, he said that the question of losses was one that was capable of mathematical demonstration to the jury or anyone else, and depended on accurate inventories at the beginning, accurate inventories at the end, and the accuracy of incoming and outgoing items.

The records contained too many errors, uncertainties and approximations to enable a jury to draw any conclusion, except unwarranted speculation, from them, in arriving at an inventory shortage conclusively proving losses caused by the dishonesty of employees. The claimed inventory shortages would seem to be equally valueless to corroborate proof of thefts by individual employees. But, in view of what has heretofore been said, we are not obliged to pass upon this latter point.

■ With regard to appellant's claim of error, we find nothing objectionable in the court's submission to the jury of the form of special verdict. It was not subject to any valid complaint that the jury was required to find the specific details of damage with precision, as the jury was instructed that it was not necessary to find the amounts of the various items "with perfect exactitude, or with precise mathematical calculation," but only that there must be some basis for computation that would reasonably afford them an opportunity to arrive at some figure that approximated correctness.

■ As to the direction by the trial judge to the court stenographer to read all of William Harris' testimony to the jury, as an introduction to his charge, we find no error. Three weeks of trial had elapsed since Harris had testified, and since appellant's case largely depended on the testimony of Harris, the trial judge, as he said to the jury, "in fairness to you, in order that you may be better able to understand the case and the charge and the work you will have to do," directed the reading of the entire testimony of Harris to the jury. We see no prejudice to appellant in this method of procedure of the trial judge.

■ Appellant further claims that the court was in error in not permitting a third person to testify as to what James Jackson admitted with respect to stealing from appellant, at the time he was arrested. Jackson was called as a witness by appellant, but refused to testify as to having admitted that he was guilty of stealing, on the ground of possible self-incrimination. Appellant then sought to prove by the third party that Jackson had admitted that he had been stealing from appellant, claiming that such a declaration on his part would be against interest, and therefore was properly admissible in evidence. The trial court held that Jackson was not a party to the case, and that it would have to be satisfied by some authoritative adjudication on the point, before ruling in favor of appellant's contention. Failing, apparently, to be furnished with such authority, the court ruled that the testimony concerning the alleged statement made by Jackson to a third person, was inadmissible. Such ruling was consonant with the decision of the Supreme Court in Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820, where, however, there was a strong dissenting opinion by Mr. Justice Holmes, concurred in by Mr. Justice Lurton and Mr. Justice Hughes. It might well be, as appellant argues, that, in the light of adjudications during the 44 years that have elapsed since the Donnelly case, the views once voiced in the prevailing opinion in that case, would no longer hold; and a declaration against interest such as was here sought to be introduced, would be held admissible. Moreover, the rule in the Donnelly case may not be applicable to other than criminal cases, for a distinction has been drawn between statements subjecting the declarant to a criminal

liability, and a statement against the declarant's pecuniary or proprietary interest, the latter kind of statement, in many cases, being considered admissible as a declaration against interest, while the former is not. Here, the alleged statement was against the pecuniary interest of the declarant, since presumably, he would be liable in a civil action for what he stole. Yet it would also be a statement which might subject him to criminal liability, and it is to be noted in this regard that Jackson refused to answer the question as to whether he had been stealing during the period in question, on the ground that his answer might be self-incriminatory. However, in the recent case of G. M. McKelvey Co. v. General Casualty Co., 166 Ohio St. 401, 142 N.E.2d 854, it was held that where an insured brought a civil action against his insurer to recover for defalcation of employees of the former, and it appeared that such employees had been summoned, but had not been found in the jurisdiction, written and signed confessions of such employees were admissible in evidence as declarations against interest as to both the fact and the amount of the loss. At the time of the trial, in the instant case, when the question as to the admissibility of such evidence arose, the trial court was well advised in requesting counsel for appellant to furnish him authority on the proposition. In any event, if it be assumed that it was error to hold as inadmissible the evidence that Jackson had told a third party that he had been stealing from appellant during the period in question, we do not consider that such ruling constituted reversible error in this case, in view of the evidence of all the various instances where the losses occurred; the many ways in which errors were made in computations by appellant; the deficiency in proof as to what was stolen, or how much was stolen; and the obvious refusal of the jury to attach any credit to appellant's evidence of losses of hundreds of thousands of pounds of meat by theft, by all the employees accused by appellant; for no error in the exclusion of evidence is ground for setting aside a verdict or for vacating a judgment, unless it is inconsistent with substantial justice. Rule 61 of the Federal Rules of Civil Procedure.

Other claims of error have been considered, but have been found without merit.

In accordance with the foregoing, the judgment of the district court is affirmed.