301 F.2d 216
 BREWERS AND MALTSTERS LOCAL UNION NO. 6, Affiliated With the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
FALSTAFF BREWING CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 16580.
 No. 16569.
 United States Court of Appeals Eighth Circuit.
 April 10, 1962.
 
 1
 Robert J. Griffith, St. Louis, Mo., for Falstaff Brewing Corp. and James P. Mannion, Jr., St. Louis, Mo., was with him on the brief.
 
 
 2
 Harry H. Craig, St. Louis, Mo., for Brewers and Maltsters Local Union 6, etc. and Norman W. Armbruster and John T. Wiley, Jr., of Wiley, Craig, Armbruster & Wilburn, St. Louis, Mo., were with him on the brief.
 
 
 3
 Morton Namrow, Atty., N.L.R.B., Washington, D. C., for respondent. Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N.L. R.B., and Melvin J. Welles and Morton Namrow, Washington, D. C., were on the brief.
 
 
 4
 Before VOGEL and BLACKMUN, Circuit Judges, and BECK, District Judge.
 
 
 5
 BECK, District Judge.
 
 
 6
 The petitioners are in these proceedings, pursuant to 29 U.S.C.A. § 160(f), seeking to set aside a July 25, 1959, final order of the National Labor Relations Board against the Union directing it to:
 
 
 7
 "(1) Cease and desist from:
 
 
 8
 "(a) Causing, or attempting to cause Falstaff Brewing Corporation, its officers, agents, successors, or assigns, to discharge employees for protesting the conduct of union officers to the Teamsters' Monitors or otherwise engaging in concerted union activities, in violation of Section 8(a) (3) of the Act; and
 
 
 9
 "(b) In any like or other manner, restraining or coercing employees of the said Company or any employee member of Respondent Union in the exercise of rights guaranteed in Section 7 of the Act, except to the extent that such rights may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized by Section 8(a) (3) of the Act, as modified by the Labor-Management Reporting and Disclosure Act of 1959.",
 
 
 10
 and as against the Company to:
 
 
 11
 "(1) Cease and desist from:
 
 
 12
 "(a) Discharging employees because they have protested the conduct of union officers to the Teamsters Monitors or otherwise engaged in concerted union activities; and
 
 
 13
 "(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act, except to the extent that such rights may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized in Section 8(a) (3) of the Act, as modified by the Labor-Management Reporting and Disclosure Act of 1959."[1], with other specific directions for offers to Gerak from the Company for immediate and full reinstatement to his former or substantially equivalent position without prejudice to his seniority or other rights and privileges and with the Union to "jointly and severally" make Gerak whole for any loss of pay he may have suffered by reason of the discrimination against him in the manner set forth in the section of the Intermediate Report, entitled "The Remedy".[2]
 
 
 14
 Other directives in the order as against the Company pertain to preservation and making available to the Board, payroll, social security, time cards and personnel records and reports and all other records necessary to analyze and compute the amount of back pay due under the terms of the recommended order, as against the Union a directive for a written notice to the Company of withdrawals of its objections to the employment of Gerak, coupled with request for full reinstatement to his former or substantially equivalent position, and as to both petitioners, the usual and customary follow-up procedurals relating to posting and notice as prescribed by the Act.
 
 
 15
 Also before us in these proceedings is the Board's cross petition for enforcement of the order, 29 U.S.C.A. § 160(e).
 
 
 16
 Actually, as the contentions of the respective parties are formulated in their arguments, we need only decide, whether or not on the record as a whole there is basis in form of substantial evidence to support the Board's charge, 29 U.S.C.A. § 160(e):
 
 
 17
 "that Lewis, in retaliation against Gerak for having attempted to curb his authority over the affairs of Local 6, caused the Company to discharge him."
 
 
 18
 This as against the Company's affirmative defense:
 
 
 19
 "that it discharged Gerak for just cause, independently of any union consideration.",
 
 
 20
 and the Union's defense being:
 
 
 21
 "primarily on the ground that it brought no pressure whatsoever upon the Company, but rather that the secretary-treasurer's primary interest was to prevail upon other union members to get along with Gerak, and to make it possible for him to continue in employment."
 
 
 22
 So scrutinized, it is admitted or undeniably established that the Union is a labor organization within the meaning of the Labor Management Relations Act of 1947, as amended, 29 U.S.C.A. § 152(5) and the collective bargaining representative for the Company's employees, including Gerak, with Robert Lewis as its secretary-treasurer, trustee, also, of Joint Council 13 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, chairman of the Joint Board of Brewery Workers, composed of three other St. Louis Brewery Locals, the head of the negotiating team for Local No. 6, in charge of grievances of its members, of certain grievances and arbitrations relating to the other three local Brewing Unions, and under his own admissions the top and headman of Local No. 6.
 
 
 23
 In this connection we note, too, that the Company, operated two breweries in St. Louis where it had its principal place of business; that it engaged in interstate commerce within the Act; that Leo Kavanaugh was and had been its superintendent since 1948, with authority to discharge employees and that no one else could, including Silvio Pucci, the Company's personnel manager.
 
 
 24
 Gerak under his own admissions and undisputed testimony in the record had been employed by the Company as a utility brewer for thirteen years before he was fired on June 4, 1959. His employment status during that period had remained the same, though others had been advanced with accompanying seniority rights, opportunity for overtime and better pay. The record as a whole, aside from any affidavits questioned as incompetent, pictured him as obnoxious, foul-mouthed and profane, prone to apply vile and indecent descriptions to others and one with a propensity for arguing and complaining. He was disliked generally, tolerated by a few, frustrated too because his employment status had not been improved, inclined to blame others rather than himself for that predicament, a trouble-maker and a constant source of irritation to the Union, its members and officers, his fellow workers, foreman, stewards and others with whom he was joined in the beer making set-up. The degree of resentment against him in the Union, is Lewis' revealed attitude toward him, as he on April 17, 1959, in a tirade of cursing and profanity declared:
 
 
 25
 "I did most of the saying. I simply said this to Oscar Gerak: `You have repeatedly, reports that I have received from a great number of members, you're working on my character, and you have called me names. Now I am warning you that if you ever call me any of these names again on or off the record, I'll knock your God damn head off.'",
 
 
 26
 with further proof of resentment against him in the plant and the Union, provided in the staged beating Gerak received at the plant on May 4, 1959, from another employee, with others who were members of the Union, witnessing the assault.
 
 
 27
 Gerak, even so, had no Company record of reprimands.[3] Profanity, vile name calling, including "muff diving fink"[4] and manners ordinarily frowned upon in most instances, were a form of kidding or joshing in the beer-fumed atmosphere of the working fraternity to which he belonged and seemingly so regarded by the workers, the Union and the management, with physical assault, rather than disciplinary measures, used as the only deterrent, when uncouth habits and conducts of an employee violated standards of accepted tolerances.
 
 
 28
 In another area of established facts, we note Gerak being incapacitated from May 4, 1959, to May 13 in the same year, as a result of the beating he got and to which we have referred. Illness kept him from working for some seven days. He continued to be absent until the 26th of the same month, when Pucci by telephone call to Gerak made inquiries concerning his health, told him of his welfare coverage, instructed him how to apply, with ending instructions for Gerak to return to work on June 1.
 
 
 29
 Admitted by all parties, is Gerak's and two other employees' written protest on May 18, 1959, by letter to Monitors of the International Brotherhood of Teamsters, Washington, D. C., requesting that organization "to investigate and correct a situation which we feel is a disgrace to decent unionism". It points to active membership in the Union of the authors, one for twenty-six years, another for twenty-three and a third for twenty-two years. It charges the Local with discrimination, favoritism, loss of wages to the writers and a seniority system giving unwarranted preferences. The letter ends:
 
 
 30
 "We know we are risking our jobs and our lives by writing this letter, but we are past being afraid any more. Just last week, one of us, Oscar Jarak, was attacked by a brewer while at work, while Jarak was talking to the steward. We did not seek any publicity about this, but went to the Teamsters Building and got medical treatment for Jarak there.
 
 
 31
 "We are not trying to hurt the Union and don't want to. We do not intend to seek publicity about this matter if it is possible to get a square deal in any other way. Instead, we are asking you to look into this matter and force Local 6 to represent us fairly. Bob Lewis has threatened to kill any man who goes to the Labor Board about this, but this does not scare us. If we can't get relief any other way, we will have no other choice.
 
 
 32
 "Please look into this matter at once. It involves the welfare of over 300 loyal union members who have taken all they can take."
 
 
 33
 This letter was signed by Hugh Pond, Godfried Link and Oscar Gerak, and copies thereof mailed to James R. Hoffa, General President of the Teamsters Union and to its President in St. Louis in care of Joint Council No. 13, of which Robert Lewis was a trustee.
 
 
 34
 On May 28, ten days after that letter had been mailed and two days after Pucci had instructed Gerak to return to work on June 1, there was a telephone call from Lewis to Pucci and on the following 4th day of June there was a letter[5] from Pucci to Gerak that the Company had decided to terminate his services.
 
 
 35
 Lewis' testimony on his own organization's posture as to the cause for the discharge, is reflected in his testimony, at one point:
 
 
 36
 "Q. So there may be no misunderstanding, Mr. Lewis, all we want is what you said, and what Mr. Pucci said during the course of the telephone conversation.
 
 
 37
 "A. I told him that I was alarmed about what I had heard and what was going on up at Plant 5.
 
 
 38
 "Trial Examiner: Did you tell him what you heard, what it was that alarmed you?
 
 
 39
 "The Witness: Yes, I told him I had received three or four anonymous phone calls.
 
 
 40
 "Trial Examiner: Did you tell him what they were about?
 
 
 41
 "The Witness: Yes, I said I had received these phone calls and was advised by people I don't know to keep my nose out of the Gerak case. They were going to take things into their own hands, and I told him I didn't know what this meant and I asked him not to let Mr. Gerak work for the time being, until I had an opportunity to investigate just how serious this was, that I felt that in due time, and I feel I have considerable influence over the membership of Local Union 6, I could pave the way for this man to return to work, not completely assuring him there wouldn't be some repercussions, but at least there wouldn't be any damage done to him or the plant, because I sincerely felt that there was concerted moves on based from the information I had gotten from the shop delegate and some of the calls, I received on the phone."
 
 
 42
 There is more in the testimony of Lewis concerning the subject matter discussed when he called Pucci on May 28:
 
 
 43
 "A. Pucci, at the close of our conversation, says, `Don't get excited, I don't know what we're going to do with the guy, I don't even know if we're going to keep him'. I said, `Suit yourself'".,
 
 
 44
 and also in his answer to the question from his own attorney:
 
 
 45
 "Q. During the course of a conversation, did you at any time ask Mr. Pucci to discharge Mr. Gerak?
 
 
 46
 "A. Mr. Craig, you know I'm much too smart for that. No, I didn't.",
 
 
 47
 and as to four other questions:
 
 
 48
 "Q. Did you suggest or intimate to him that you wish Mr. Gerak would be discharged?
 
 
 49
 "A. I think, Mr. Craig, that I made my position very clear in the statement I made a moment ago. I simply said to Mr. Pucci, `Don't let this guy go to work until I get an opportunity to check into this thing and see if I can't suppress what's taking place. I feel I can pave the way for this man to return to work. I'm not guaranteeing anything, and I've given the shop steward instructions, but he's only an individual and couldn't hold down any serious demonstrations.'
 
 
 50
 "Q. During your conversation with Mr. Pucci, did you either ask him to discharge Mr. Gerak or suggest or intimate you wanted him to do so?
 
 
 51
 "A. Emphatically, no.
 
 
 52
 "Q. All right, sir. Mr. Lewis, did you at any other time, either ask of any officer or official of the company that Mr. Gerak be discharged, or suggest or intimate that you would like him discharged?
 
 
 53
 "A. No, sir, I did not.
 
 
 54
 "Q. All right. Insofar as your knowledge is concerned, have you ever heard or do you know whether any officer, agent or even shop delegate of Local 6 has either asked for the discharge of Mr. Gerak or has suggested or intimated that the union wanted it?
 
 
 55
 "A. There is no officer, no shop delegate, directly or indirectly, reference, influence, or otherwise had anything to do with Mr. Gerak's discharge, and I gave Mr. Tony Casselli strict instructions to keep his nose out of anything that in any way inferred that the union had anything to do with it."
 
 
 56
 Another related matter is the special September 1959 meeting of the Union called by Lewis, where he presided and berated Gerak because of his letter to the Monitors and where he abusively attacked the National Labor Relations Board.
 
 
 57
 Pucci's testimony as to the Company's reason for the discharge is substantially covered in his answer to the question from his Company's counsel:
 
 
 58
 "Q. As I understand it, the question was asked: `Why did you terminate Mr. Gerak?'. My question is: What was your response?
 
 
 59
 "A. I say again, if I can recall what I said, I referred to several instances to what we deemed were undesirable situations that occurred. I believe I went so far as to say that he was discharged as an undesirable character. He asked me for specifics. I told him I did not desire to go into specifics at that time * * *
 
 
 60
 "Q. Tell us whether or not there was any conversation concerning union representatives.
 
 
 61
 "A. No. My recollection of that conversation was in referring to him various instances we regarded as undesirable. I indicated to him that I got this information from union employees. I might have said union members, but I distinctly did not say union representatives.
 
 
 62
 "Q. Will you tell us whether or not you are aware of any phone calls from Mr. Gilpin subsequent to this?
 
 
 63
 "A. I have no record, no reference calls whatsoever from his office."
 
 
 64
 Gilpin, attorney for Gerak, and a witness in his behalf, testified that he had written a letter to the Company concerning the reasons for Gerak's discharge; that he had received no reply, except a telephone call from Pucci on July 16, and in Kavanaugh's testimony, a witness for the Company, is this answer as he replied to questions concerning the effect of fighting among the men at the plant.
 
 
 65
 "A. Well, we don't fire anyone for fighting, because it is pretty well, I mean, that happens, we don't fire them on the grounds of fighting. We are not judges, we don't know which one is the guilty one, they might be both guilty. We have never fired anyone for fighting.
 
 
 66
 "Q. As a matter of fact, ordinarily when you have a fight you transfer the people to another plant or another section of the plant.
 
 
 67
 "A. Not necessarily.
 
 
 68
 "Q. You try to get them apart, don't you?
 
 
 69
 "A. We try to work it the best way we know how. If two personalities clash, naturally we don't want them working together all the time, because it is not good for the efficiency of the plant."
 
 
 70
 The Board as it made the controverted finding, indulged in inferences which under the facts we regard as permissible. Patapsco Scrap Corp. v. Maryland Shipbuilding & Drydock Co., 4 Cir., 268 F.2d 817 (1959), Walker v. United States Gypsum Co., 4 Cir., 270 F.2d 857 (1959), cert. den. 363 U.S. 805, 80 S.Ct. 1240, 4 L.Ed.2d 1148; McDermott v. John Baumgarth Co., 7 Cir., 286 F.2d 864 (1961); National Sur. Corp. v. Wells, 5 Cir., 287 F.2d 102 (1961); Boudoin v. J. Ray McDermott & Co., 5 Cir., 281 F.2d 81 (1960); and Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217 (1954). Pucci, for instance, obviously had authority to tell Gerak to report back for work, else, he would not have made the request. This is a common sense inference. Gerak's habits and character could not have been the reason for the dismissal since the Company knew as much about that aspect on May 26 when Gerak was told to return as it did on the date of dismissal. Friendly was the tone of Pucci's communications on May 26. It obviously would have been otherwise, or, at least reserved, had a dismissal then been contemplated. The suggestion that Kavanaugh's instructions to Pucci, might have been the reason why the latter mailed the letter of dismissal after telling Gerak on May 26 to report back for work on June 1, has little force or probative value since Kavanaugh wasn't sure that his conversation with Pucci might not have been had on May 25.
 
 
 71
 No plausible basis for the Company's changed attitude toward Gerak, from May 26[6] to June 4, is in the record, other than an inference that Lewis, as head of the Union, on May 28, told Pucci, that Gerak because of his letter to the Monitors had to be discharged and that the Company therefore terminated Gerak's employment on June 4. Such a demand is implied in Lewis' own comment, while examined by his counsel, that he was too smart to ask Pucci to discharge Gerak, and therefore, as we view the record, quite consistent with the Board's refusal to believe that Lewis' phone call was only in the interest of better relations among the employees and not because his own position in the Union had been and was being jeopardized. See cases cited in the preceding paragraph of this opinion and National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 and Onan et al. v. National Labor Relations Board, 8 Cir., 139 F.2d 728 (1944).
 
 
 72
 The Board, under the record as a whole, could choose between either one of two permissible inferences, one favoring the theory espoused by the appellants, the other that of the Board's. As it rejected the one in preference to the other, it followed the well established rule referred to in National Labor Relations Board v. Des Moines Foods, Inc., 8 Cir., 296 F.2d 285 (1961) as the court in that case quoted from the National Labor Relations Board v. Nevada Consolidated Copper Corp., supra:
 
 
 73
 "The possibility of drawing either of two inconsistent inferences from the evidence did not prevent the Board from drawing one of them, as the court below seems to have thought.",
 
 
 74
 and we note the following statement in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 465, 95 L.Ed. 456:
 
 
 75
 "* * * To be sure, the requirements for canvassing `the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo. * * *"
 
 
 76
 See also, National Labor Relations Board v. Marcus Trucking Co., Inc., 2 Cir., 286 F.2d 583 (1961); Donnelly Garment Co. v. National Labor Relations Board, 8 Cir., 123 F.2d 215 (1941); National Labor Relations Board v. Thompson Products Inc., 6 Cir., 97 F.2d 13 (1938); Foote Bros. Gear & Mach. Corp. v. National Labor Relations Board, 7 Cir., 114 F.2d 611 (1940) and Onan et al. v. National Labor Relations Board, supra.
 
 
 77
 On that record we agree with the Board that there is "substantial evidence" 29 U.S.C.A. § 160(e), to support its findings: "that by discharging Gerak on June 4, 1959, at the request of Local 6, the Respondent Company discriminated against him in violation of Section 8(a) (3) and 8(a) (1) of the Act, and that by causing such discrimination by the Respondent Company, the Respondent Union violated Section 8(b) (2) and Section 8(b) (1)(A) of the Statute."
 
 
 78
 Errors assigned, other than those urged under said "substantial evidence" rule are to the effect: (1) that the Board could not impeach its own witnesses, Leo Kavanaugh and Silvio Pucci; (2) that Silvio Pucci was not subject to impeachment under Rule 43(b), Fed.Rules Civ. Proc., 28 U.S.C.A.; (3) that affidavits used for impeachment purposes could not be used and relied on as substantive proof; (4) that extra-judicial affidavits of Board witnesses could not be used for any purpose and (5) that the order is too broad for it would go far beyond any remedy for Gerak.
 
 
 79
 As for the contention that Kavanaugh, the Company's superintendent, and Pucci, its personnel manager, were the Board's witnesses and their testimony on direct therefore not to be impeached or elicited by leading questions, suffice it to say that both were called as witnesses for the Board under 43(b), F.R.C.P., without any objections by either of the appellants that the rule was improperly being invoked. Neither in the few objections to the testimony of Kavanaugh nor in the numerous ones to that of Pucci, is there anything to suggest that the Board was put on notice that the two were not "managing agents" within the meaning of that rule, or that they could not have been qualified as such had timely and proper objections been made. The consequences of such omission at the trial, as well as before the Board, 29 U.S.C.A. § 160(e), are disposed of in 5 Moore's Federal Practice, 2nd Ed., Section 46.02, p. 1903 in a comment:
 
 
 80
 "* * * It is still necessary for the party to make it clear to the court that he objects to the court's action, and to state the grounds on which he bases his objection, in order that the defect may be obviated, if possible, and as a general rule, therefore, points not raised and preserved below will not be considered on appeal unless they amount to `fundamental error' * * *."[7]
 
 
 81
 See also Sucher Packing Company v. Manufacturers Casualty Ins. Co., 6 Cir., 245 F.2d 513 (1957); Taylor v. Taylor, 8 Cir., 211 F.2d 794 (1954); Harris v. Harris, 90 U.S.App.D.C. 239, 196 F.2d 46 (1952), cert. den. 344 U.S. 829, 73 S. Ct. 34, 97 L.Ed. 645; Capella v. Zurich General Accident Liability Ins. Co., 5 Cir., 194 F.2d 558 (1952); United States v. Barndollar & Crosbie, 10 Cir., 166 F.2d 793 (1948); Employers Mutual Casualty Co. v. Johnson, 5 Cir., 201 F.2d 153 (1953); Koolvent Metal Awning Corp. of America v. Bottom, 8 Cir., 205 F.2d 209 (1953); Fort Worth & Denver Ry. Co. v. Harris, 5 Cir., 230 F.2d 680 (1956) and Gargac v. Smith-Rowland Co., 7 Cir., 170 F.2d 177 (1948).
 
 
 82
 This rule is particularly applicable, we think, as a person is called to testify as "managing agent" under 43(b), F.R.C. P., since his designated position is one which depends on all of the facts and circumstances in the case where his authority as such is being challenged. Newark Insurance Co. v. Sartain, Cal., 20 F.R.D. 583 (1957), Independent Productions Corp. v. Loew's, Inc., N.Y., 24 F.R.D. 19 (1959) and June T., Inc. v. King, 5 Cir., 290 F.2d 404 (1961). Strict adherence to the rule in such cases, is a must if the purposes referred to in Moore (Footnote 7) are to be met
 
 
 83
 Urged as fatal to the Board's case and grounds for reversal is its conjunctive use of Pucci's fifteen-page affidavit for impeachment of his oral testimony and as substantive or affirmative evidence to provide a factual basis which entered into the Board's decision.
 
 
 84
 Such dual use is not permitted. National Labor Relations Board v. Quest-Shon Mark Brassiere Co., 2 Cir., 185 F.2d 285 (1950). Whether or not the affidavit's admission in evidence for both of those purposes resulted in anything more than harmless error is something else, because as said in Builders Steel Co. v. Commissioner of Internal Revenue, 8 Cir., 179 F.2d 377 (1950):
 
 
 85
 "In the trial of a nonjury case, it is virtually impossible for a trial judge to commit reversible error by receiving incompetent evidence, whether objected to or not. An appellate court will not reverse a judgment in a nonjury case because of the admission of incompetent evidence, unless all of the competent evidence is insufficient to support the judgment or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would not otherwise have been made." Thompson v. Carley, 8 Cir., 140 F.2d 656 (1944); Doering v. Buechler, 8 Cir., 146 F.2d 784 (1945) and Grandin Grain & Seed Co. v. United States, 8 Cir., 170 F.2d 425 (1948).
 
 
 86
 Dispositive ruling concerning competent substantial evidence having been produced to support the final order, we have left the question whether it would have been entered but for the use of the affidavit as substantive proof.
 
 
 87
 Some of the Board's observations in its findings, seemingly point in the direction of "affirmatively" having had that effect, as the excerpts therefrom:
 
 
 88
 "* * * the story of individual witnesses at times seems inherently incredible or because the oral testimony is in conflict with the extended prior affidavit of the personnel manager of the Company. * * *.",
 
 
 89
 Pucci testified that he first learned of the Gerak affair when Kavanaugh spoke to him about it on May 26. He said Kavanaugh had already decided to discharge Gerak and so instructed Pucci that day. His affidavit instead reads that Kavanaugh `asked me to investigate the absence from work of Oscar Gerak * * * he told me that Gerak had been in the fight and he figured that he had been absent because of it. Kavanaugh asked me to check into the matter to see when Gerak was returning to work * * *. At that time there was no thought of discharging Gerak due to the altercation; we just wanted to learn when he would be available for work.' In direct conflict with Kavanaugh's testimony relating to the May 26 conversation, the affidavit makes no mention of Miller's investigation or any complaints regarding Gerak's behavior or employee animosity toward him., I am utterly unable to reconcile either the respective oral testimony of these two men, or the hopeless disagreement between their contradictory testimony and Pucci's affidavit., I do not credit any of the testimony offered by Kavanaugh and Pucci at the hearing with respect to the conversation they said they had on May 26 and thereafter. Kavanaugh testified he told Pucci on the 26th to discharge Gerak. Pucci's affidavit flatly contradicts this. Kavanaugh also testified he detailed to Pucci on that same day the derogatory reports resulting from Miller's 10 day investigation. Pucci swore to the contrary, and his affidavit shows clearly Kavanaugh never mentioned criticism of Gerak until after Lewis had called Pucci." (Emphasis supplied)
 
 
 90
 But those observations, which we regard as no more than comments on the evidence, in view of the form of the findings of fact and conclusion of law,[8] fall far short of the "affirmative" showing referred to in Builders Steel, since apart from the affidavit, as we have ruled, there was, in the timing of the series of events preceding the precipitous dismissal on June 4, in Lewis' hatred of Gerak, in his intolerance towards any one whose acts threatened his powers, prestige and high command in the Union and in the benign attitude, generally, toward offensive conduct and habits of the respective employees, an impelling inference that the Monitor letter prompted Lewis on May 28, as head of and in the name of the Union to demand that Gerak be discharged and, hence, no affirmative basis for an inference that anything in the affidavit led to the "essential finding" on this point. Builders Steel Co. v. Commissioner of Internal Revenue, supra.
 
 
 91
 Neither can we ascribe "affirmative" proportions to the substantive effect of the affidavit on the Board's refusal to hold the discharge to have been for cause. Effect of Pucci's affidavit, if not completely destroyed, is at least weakened to the extent it could not measure up to evidence having "affirmative" effect, by Kavanaugh's oral testimony, as he admitted: (1) that his conversation with Pucci might have been on May 25, the day before Pucci's call to Gerak; (2) that Kavanaugh, prior to May 26, had decided, either on no immediate action being necessary, or none at all warranted, if he was correct in his testimony that he got the Miller report about ten days or three weeks from May 5 when he ordered it procured; and (3) that he might not have gotten the Miller report until in June in which event he did not call Pucci concerning Gerak until the middle part of that month. Builders Co. v. Commissioner of Internal Revenue, supra.
 
 
 92
 Appropriately, referred to as a rule related to the one we have discussed and applied under the facts in this case, is the general one that improper admission of incompetent evidence which is merely cumulative on matters clearly shown by other admissible evidence is harmless error. Gerhart v. Henry Disston and Sons, Inc., 3 Cir., 290 F.2d 778 (1961); Rule 61, F.R.C.P., Walsh v. Bekins Van Lines Co., 8 Cir., 217 F.2d 388 (1954) and Atlantic Coast Line R. Co. v. Burkett, 5 Cir., 192 F.2d 941 (1951). Within this rule are the complaints in the assignment of error referred to herein as (4) concerning use of extra judicial affidavits.
 
 
 93
 Finally, error is assigned on the ground that the scope of the order is too broad, noted by the Company without citation of authority and without any argument, except an observation, that the "remedy should have been confined to Gerak and not all employees". Like complaint is made by the Union under this assignment, with cases cited, which, however are of little aid in view of the record on this point.
 
 
 94
 National Labor Relations Board v. May Department Stores Co., 8 Cir., 154 F.2d 533 (1946), provides a guide:
 
 
 95
 "As to blanket prohibition in paragraph 1(b), the Supreme Court has stated that it is the Board's province `to determine the needed scope of cease and desist orders under the National Labor Relations Act' and the function of the courts merely to test as a matter of law whether the scope of a particular order has a reasonable basis in the situation presented. May Department Stores Co. v. National Labor Relations Board, 326 U.S. 376, 66 S.Ct. 203, 212, 213, 90 L.Ed. [495] `The test of the proper scope of a cease and desist order is whether the Board might have reasonably concluded from the evidence that such an order was necessary to prevent the employer before it "from engaging in any unfair labor practice * * * affecting commerce."' Id., 66 S.Ct. at pages 211, 212. The Board may not enjoin violation of the provisions of the Act generally merely because a violation of one provision has been proved. `To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past.' National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930. But the situation may present such an attitude of opposition to the purposes of the Act as to warrant the Board in concluding that unfair labor practices generally, and not merely of the type involved in the immediate proceeding, are likely to occur and should be prevented. Where the Board can so reasonably conclude, the courts should not undertake to delimit its order."
 
 
 96
 See also National Labor Relations Board v. United Mine Workers, 6 Cir., 195 F.2d 961 (1952), that the Board, under the Act, has broad powers in determining the necessary scope of its orders, but on the other hand not the authority to enjoin violation of all provisions of the Act, merely because it finds one provision to have been violated. National Labor Relations Board v. Swift & Co., 3 Cir., 162 F.2d 575 (1947), cert. den. 332 U.S. 791, 68 S.Ct. 101, 92 L.Ed. 373.
 
 
 97
 While paragraphs (1) (a) of the cease and desist order, clearly are within this record, it is otherwise as to paragraphs (1) (b). Covered by this record, is the right of employee, under Section 7 of the Act, 29 U.S.C.A. § 157, "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection", but the others, relating to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing", are not. (Emphasis supplied). National Labor Relations Board v. May Department Stores Co.; National Labor Relations Board v. Swift & Co., supra, and National Labor Relations Board v. Standard Metal Fabricating Co., 8 Cir., 297 F.2d 365 (1961).
 
 
 98
 Paragraphs (1) (b) insofar as they pertain to the cease and desist order against the Company and the Union will and are hereby amended to read as follows:
 
 
 99
 In any like or other manner, restraining or coercing employees of the said Company or any employee member of Respondent Union in the right to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection guaranteed in Section 7 of the Act, 29 U.S.C.A., Section 157, except to the extent that such rights may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized by Section 8(a) (3) of the Act as modified by the Labor-Management Reporting and Disclosure Act of 1959.
 
 
 100
 with corresponding changes in the notices required under the Act.
 
 
 101
 With such modification, the Board's order will be enforced.
 
 
 
 Notes:
 
 
 [1]
 Those orders and other parts thereof referred to in this opinion are based on Oscar Gerak's complaint against the Company, which, aside from formal parts thereof, is as follows:
 "The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (3) of the National Labor Relations Act, and these unfair labor practices are unfair labor practices affecting commerce within the meaning of the act.
 
 
 [2]
 Basis of the Charge (Be specific as to facts, names, addresses, plants involved, dates, places, etc.)
 On or about June 4, 1959, Falstaff Brewing Corporation, by its officers, agents and representatives terminated the employment of Oscar Gerak, one of its employees, because of a request so to do by the Brewers and Maltsters Local Union No. 6, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a labor organization, and at all times since that date it has refused and does now refuse to employ the above-named employee.
 By the above acts and by other acts and conduct the Employer has interfered with, restrained and coerced its employees and is interfering with, restraining and coercing its employees in the rights guaranteed them by Section 7 of the Act.",
 and as against the Union:
 "The above-named organization or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of Section 8(b), Subsection(s) (1) (A) & 8(b) (2), of the National Labor Relations Act, and these unfair labor practices are unfair labor practices affecting commerce within the meaning of the act.
 
 
 [2]
 Basis of the charge (Be specific as to facts, names, addresses, plants involved, dates, places, etc.)
 On or about June 4, 1959, Brewers and Maltsters Local Union No. 6, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, by its officers, agents or representatives caused Falstaff Brewing Corporation to discriminate against Oscar Gerak by requesting and causing his discharge in violation of the provisions of Section 8(a) (3) of the Act.
 By the above acts, and by other acts and conduct, it, by its officers and agents, restrained and coerced employees, and is restraining and coercing employees in the exercise of the rights guaranteed by Section 7 of the Act."
 Those allegations of the respective complaints were formally denied in the answer of the Union and the Company.
 
 
 [2]
 "Having found that Respondent Local 6 and Respondent Falstaff Brewing Corporation have engaged in certain unfair labor practices, I will recommend that they cease and desist therefrom and take certain affirmative action designed to effectuate the policies of the Act
 As to Local 6, I will recommend that it cease and desist from causing or attempting to cause Falstaff Brewing Corporation to discharge employees for protesting the conduct of union officers to the Teamster Monitors or otherwise engaging in concerted union activities. As to the Respondent Company I shall recommend that it be ordered to cease and desist from discharging employees for engaging in such conduct.
 I shall also recommend that the Respondent Union and the Respondent Company jointly and severally make Oscar Gerak whole for any loss of pay he may have suffered by reason of the discrimination against him, said loss of pay to be computed on a quarterly basis in accordance with the formula adopted by the Board in F. W. Woolworth, 90 N.L.R.B. 289. I shall also recommend that the Respondent Union be required to notify Oscar Gerak and the Respondent Company in writing that the Respondent Union has no objection to his employment by the Company. The Respondent Union shall not be liable for any backpay which may accrue for the period beginning 5 days after it notifies the Company and Oscar Gerak as aforesaid. It is also recommended that the Company make available to the Board, upon request, payroll and other records to facilitate computation of the amount of backpay due.
 In view of the nature of the unfair labor practices committed, the commission by the Respondents of similar and other unfair labor practices may be anticipated. The remedy should be coextensive with the threat. I will therefore also recommend that the Respondents be ordered to cease and desist from infringing in any manner on the rights of employees guaranteed in Section 7 of the Act."
 
 
 [3]
 A record of all reprimands administered to employees by the Company was a part of its official records
 
 
 [4]
 A vulgar and indecent appellation applied to an individual according to the context. We have found no dictionary definitions
 
 
 [5]
 
 "Mr. Oscar Gerak, June 4, 1959.
 "4120 Colvin,
 "St. Louis 23, Mo.
 "Dear Oscar:
 "I have been trying to reach you by telephone for several days but to no avail. Please be advised that the company has decided to terminate your services. The decision to discharge you is the result of an investigation of several undesirable matters which were brought to our attention during your absence.
 "I would appreciate a call from you to discuss the settlement of any benefits to which you may be entitled and make necessary arrangements for the handling of same.
 "Yours truly,
 "SILVIO PUCCI,
 "Personnel Manager.
 "SP/ct
 "cc: Mr. L. Kavanaugh."
 
 
 [6]
 Kavanaugh's testimony is to the effect that he talked to Pucci on May 26 or a day earlier or a day later
 
 
 [7]
 The reasons for that rule are referred to in the first part of that Section, which is as follows: "Rule 46 makes necessary the taking of formal exceptions to rulings or orders of the court. The practice of taking formal exceptions was gradually being abandoned before the rules were promulgated, but could be applied so as to result in injustice. The rule retains, however, the fundamental basis of the former practice by requiring a party to make known to the court the action desired, and his grounds therefor, at the time the ruling or order is made or sought, if he has an opportunity to do so. The purpose of the former practice of a formal exception was two fold: (1) to apprise the court of the litigant's position so that the court in the furtherance of justice might correct its ruling where shown to be in error; and (2) to permit an opponent to obviate the defect where possible. Rule 46 retains this purpose." See also 4 C.J.S., Appeal & Error § 228, National Labor Relations Board v. Garfunkel, 2 Cir., 162 F.2d 256 (1947) and as for related questions 35 A.L.R.2d pages 756-760
 
 
 [8]
 Board's Findings and Conclusions are divided into categories: (1) the business of the Company; (2) the labor organization involved; (3) the unfair labor practices, including what is called "a picture of the case"; (4) unquestioned evidence; (5) the questionable evidence relating to the Company's reason for the discharge and the respondent Union's participation in that decision; (6) further pertinent evidence, analysis and conclusions; (7) the effect of the unfair labor practices upon commerce; (8) the remedy; (9) conclusions of law and (10) recommendation. Included therein and commingled, is evidence, comments thereon, opinions, arguments, findings of ultimate facts and conclusions