## NATIONAL LABOR RELATIONS BOARD v. REYNOLDS WIRE CO.

### No. 7604.

Circuit Court of Appeals, Seventh Circuit.

June 12, 1941.

Order modified and, as modified, directed to be enforced.

Robert B. Watts, of Washington, D. C., I. S. Dorfman, of Chicago, Ill., and Lewis M. Gill, of Washington, D. C., for petitioner.

Robert L. Bracken, of Dixon, Ill., and Roger Robb, of Washington, D. C., for respondent.

Before MAJOR and KERNER, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

The National Labor Relations Board ordered the Reynolds Wire Company, an Illinois corporation engaged in interstate commerce for purposes of the Act, to cease and desist from its unfair labor practices and from giving effect to its contracts with

the Reynolds Wire Employees Association. In addition it directed respondent to offer reinstatement with back pay to the discharged employee, to disestablish the Association and to post appropriate notices. 26 N.L.R.B., No. 69. The complaint charged the respondent with violations of Sections 8(1), 8(2) and 8(3) of the Act, 29 U.S.C.A. § 158(1–3), and the Board made findings of (1) interference, restraint and coercion, (2) domination and support of the Association and (3) discriminatory discharge of employee George Carlson. The questions for our decision are whether the findings are supported by evidence and whether the order is valid.

In the summer of 1936, when four employees approached Charley Trotter, the plant superintendent, concerning a wage increase, Trotter had occasion to state that "If you'll take my advice you'll stay out of all outside unions." He informed them, however, that a "Factory Union" in a nearby town had been found very satisfactory, and suggested that if the men wanted "to have a little union among ourselves here·at Dixon, the company wouldn't object to it."

Early in 1937, Harold Bay, an employee, approached John Ralston, president of the plant, for a departmental wage increase, and in the ensuing discussion the question of union activity in the plant came up. Although expressing a preference for the A.F.L. over the C.I.O., Ralston opposed the organization of any affiliated union in the plant, and suggested instead "a little union of your own" which would keep its dues receipts in town and eliminate the interference of outsiders. Some four weeks later, after a wage increase had been granted, Bay told Ralston that a C.I.O. local was being considered by the employees. Ralston observed that "John L. Lewis was [not]. the right kind of a labor leader; that he was too radical, that he wanted to be a dictator and was stirring up trouble."

Shortly after the Supreme Court decisions of April 12, 1937, upholding the validity of the Act, Ralston addressed the entire plant personnel at one of the regular monthly safety meetings. He announced "that he preferred that the employees form no union; that * * * the company's policy of always having the executives' door open to the employees for submitting grievances was sufficient in our small company * * * that if they wished to join a union that his second preference was for an independent union; lastly that they were free to join any union."

In July of the same year, Bay and a group·of employees conferred with Ralston in regard to a projected affiliation with A.F.L. Ralston told them that "I don't see any need for you fellows having a union here," again suggested an inside union as the solution, and added that an inside union would involve no high salaries and could be incorporated by State charter. At about the same time, L. E. Dunkelberger, manager of the plant, admonished employee Campbell for reportedly "talking union on the job," and explained that Ralston did not "mind if the boys had a union of their own" but that Ralston "didn't want any outside union here."

In September of 1937 a group of the employees met to organize a local of the C.I.O. On the following day, one of them, Parker Barton, initiated the circulation of several petitions which read as follows:

Vote by Signing Name Under Column—And Marking X Under Your Choice

| | Yes | No | |
|---|---|---|---|
| Shall we organize a Company Union and give it a fair trial before inviting an outside organization in. | | · · | Sign here if you prefer to remain as we are. |

For the next few days, these petitions were circulated by Barton, by another employee, Albert Spinden, and by Laidag. Spinden testified that the circulation of the petitions was "the first effort to start the Association." Laidag was an hourly worker who during the summer·of 1937 was tried out "as a potential foreman," who acted as substitute foreman from September 4 to September 17, and who later became a regular foreman.

It also appears that the circulation of·the petitions occurred during working hours, and that the solicitation of signatures thereto was accompanied by such introductory statements as "We have got a petition here to get a company union, so as to keep outside unions from coming in" and "[we are] trying to get up a company union with group insurance." On one occasion, Laidag engaged several employees, who left their machines to listen ·to his appeal and who then signed the petition, all within sight of the foreman. Laidag argued that "if the C.I.O. gets in here they will be calling you out on strike every week * * *. Other men will run the union for you and they will take all of your money and on top of that, they will bring in a lot of outside agitators and gangsters." On

another occasion, an employee first went to his foreman and received the foreman's permission to sign, then he joined a group of 4 or 5 employees listening to solicitor Spinden, 10 to 30 feet from their machines and in view of the foreman.

Fred Yates, an employee interested in the C.I.O., went to the office of Dunkelberger and complained about Barton's solicitation activities, but Dunkelberger answered that he did not have the right to reprimand Barton. At this moment Barton entered the office, and the relative merits of the C.I.O. and an independent union were discussed. Dunkelberger disparaged the C.I.O., failed to reprimand Barton and ended up by asking Yates to "go along with the boys" in case the company union were formed. Dunkelberger testified that he criticized Barton's activity in the plant as "not in accordance with our stand of neutrality with regard to all union organizations."

Ralston died late in September, and on the following day Dunkelberger called in employee Bay and inquired whether he had been organizing for the A.F.L. Bay attributed the following words to Dunkelberger: "I want to make this clear: The Company don't want any union at all, but if the fellows want a union, of course, it would be a little inside union * * * if that wasn't satisfactory it would be the A. F. of L. * * * if it was the C.I.O. the plant might shut down." In the end it was agreed by them that a memorial truce in all organizational activity would be fitting, and subsequently Barton and Yates agreed to a 30-day truce.

Shortly thereafter, Barton notified Dunkelberger that he was withdrawing from the agreement and that he had arranged a meeting of the employees for October 9, 1937, at a local hall to determine, by an election, upon a form of organization. According to Dunkelberger's testimony, he then "sent word by the foremen to the various parties * * * interested in union activities so that everyone would know that this meeting was being held and that they were to be given a free choice of expressing the majority's opinion at that meeting." On the day of the meeting, Dunkelberger "cooperated by closing the plant down," and various employees, upon reporting for work, were directed by the foremen to leave the plant for the meeting hall.

The record also shows that Bay expressed his dissatisfaction with the proposed meeting to Eric Gerdes, foreman, and Gerdes responded by advising Bay to "get in and help form this company union, that it would be just as effective as an outside union." In addition, at about the time of the Association's formation, Superintendent Trotter asked employee Omer Ryan to "get in and help us" organize "this company union," and he suggested to employee Paul Mondlock that "it will be all right if you go out among the men and tell them that they could form a little union of their own" and that "it would be much better than to have outside organizers in here stirring up trouble, causing a strike and disturbance, and us handing out our money and having it go out of town."

The meeting was held as scheduled on October 9, 1937, with Parker Barton presiding as chairman. Bay suggested that a debate be held to determine what union the men wanted "because nobody had had time to think it over as to what we wanted," but Barton and Spinden were against this idea. Barton then announced and conducted the election to ascertain whether the personnel preferred an independent union, the A.F.L., the C.I.O., or no union at all. Barton also appointed the tellers, of whom 3 were proponents of an independent union, 1 of the A.F.L., and none of the C.I.O. The employees voted a preference for some form of independent union, and a week later, on October 16, the Association was formally organized, Spinden and Barton being elected president and vice-president respectively. In February of 1938 the respondent signed an agreement with the Association, and in July of 1938 it renewed the contract, granting the Association exclusive bargaining rights.

In January of 1938 the Amalgamated (the C.I.O. affiliate which filed the charges herein) was organized and undertook a membership campaign. Harold Bay, who at first had shown an interest in the A.F.L., joined the C.I.O. and wore the C.I.O. button to work. When foreman Gerdes saw the button on Bay, he said "Hello, Bayinski." Employee Joseph Koepeck also joined the C.I.O., and he was warned by foreman Bert Meeks that he "would get fired if I [he] ever talked union around here." On the first day that he wore his button, Dunkelberger called him in the office and said to him: "I heard you was down there [in

the machine shop] soliciting members for the C.I.O. * * *. I'll give you one more chance. Now, get back up there and get to work, and I don't want to hear any more agitation from you."

Indeed the facts set out above are not consistent with Dunkelberger's testimony that respondent was "absolutely neutral," but we must accept what the Board has stamped with approval and credence. It is manifest from these facts, and from the reasonable inferences flowing therefrom, that the Association was not the product of the employees' free choice "because the Company had interfered to impair their freedom." New Idea, Inc. v. National Labor Relations Board, 7 Cir., 117 F. 2d 517, 523, and National Labor Relations Board v. New Era Die Co., 3 Cir., 118 F.2d 500. As the triers of fact we would have had some doubt that the employees were "acting for him [the employer] rather than for themselves," Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 762, but as the reviewers of fact we can not say that the Board was wrong in doing what it did. Certainly the respondent's conduct can not be described as the "utmost of honest neutrality." Valley Mould & Iron Corp. v. National Labor Relations Board, 7 Cir., 116 F.2d 760, 764.

We are satisfied that the facts set out above furnish substantial evidence for the Board's findings, and that the Board properly concluded that the Association was merely a reflection of the respondent's interference. Nor is our conclusion in this matter any the less valid because a majority of the employees present at the October 9 meeting voted for an independent union. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368.

After reviewing the record relating to the discriminatory discharge of George Carlson, we are of the opinion that the Board's finding in this regard is supported by the evidence. At first Carlson had joined the Association but in December of 1937 he dropped out. Foreman Gerdes urged him to rejoin the Association, but instead he joined the C.I.O. union in January of 1938 and became its first secretary. When Gerdes saw Carlson wearing his C.I. O. button at work, he accosted Carlson with an obscene epithet. Carlson continued his C.I.O. activities and served as secretary, treasurer and member of the bargaining committee. On May 21, 1938, he was discharged for writing a remark on the recently painted inner door of the factory toilet, the remark obscenely characterizing the paint job. Carlson confessed to the indecent scribbling upon Gerdes' promise to forget the incident, and then offered to erase the remark which had been written with a pencil.

The record discloses that the toilets in respondent's factory were repainted periodically but that for years it was characteristic behavior on the part of the employees to inscribe the inner walls and doors with indecent markings. In the past the management had often requested desistance of its employees, but at no time had it indicated that such scribbling in the toilets constituted an offense warranting the discharge penalty. Never before had the respondent undertaken to discharge an employee for such conduct, and evidence pertaining to two previous incidents, obviously not comparable, can not be viewed as a precedent for the discharge. Under all the circumstances, we can not say that the Board was unreasonable and erred in its conclusion that Carlson was in fact discharged because of his union activities, especially if we take in consideration the respondent's hostility to outside unions, Carlson's C.I.O. partisanship, and the unconvincing nature of the reason given for the discharge of an employee of 5 years' standing.

We conclude therefore that the Board's order, with the modifications soon to be described, is valid and proper.

Respondent points out that paragraph 1(e) of the order falls squarely within the reasoning of National Labor Relations Board v. Express Publishing Co., 61 S.Ct. 693, 700, 85 L.Ed. ——. We think, however, that the general injunctive order is clearly proper, since the record reveals "persistent attempts by varying methods to interfere with the right of self-organization." Express Publishing Co. case, supra, page 700 of 61 S.Ct. and American Enka Corp. v. National Labor Relations Board, 4 Cir., 119 F.2d 60. Cf. National Labor Relations Board v. Calumet Steel Division of Borg-Warner Corp., 7 Cir., 121 F.2d 366, decided by this Court June 12, 1941.

However, the "work-relief provision" in paragraph 2(b) of the order is in excess of the Board's powers. Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 12, 61 S.Ct. 77,

85 L.Ed. 6. Paragraph 2(b) of the order shall be modified by the deletion of the following language: "and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for such work-relief projects." In addition, the order disestablishing the Association must be "without prejudice to the rights of employees, if they should see fit, to seek in a proper proceedings certification of another bargaining agent." National Labor Relations Board v. Aluminum Products Co., 7 Cir., 120 F.2d 567 decided by this court March 4, 1941. See also Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 523, 61 S.Ct. 320, 85 L.Ed. 309.

MAJOR, Circuit Judge (concurring in part).

In the main I concur in the opinion. I dissent from that part, however, which sustains the Board's conclusion relative to the alleged discriminatory discharge of George Carlson, and to Paragraph 1(e) of the order.

In my opinion the evidence discloses sufficient justification for the discharge of Carlson. In fact, this is tacitly conceded by the Board in its brief, wherein it states: "* * * It must be kept in mind that the question is not whether respondent would have been justified in discharging Carlson for the reason asserted. * * *" The question, as stated by the Board, is whether it was justified in concluding that "he was in fact discharged because of his Union activities rather than for the reasons advanced by respondent." It must be remembered that the burden was on the Board to establish its theory. Its conclusion is based solely upon inference drawn from the general situation upon which it relies to overcome respondent's theory, supported by direct, positive and undisputed evidence. The inference thus indulged in must, in my opinion, give way and is not sufficient to sustain the Board's theory in face of direct evidence supporting a different theory. Assuming that the evidence furnishes equal support to both theories, a charitable assumption in favor of the Board, yet it has not sustained the burden required by law. Proof of two theories equally compatible does not prove either.

Paragraph 1(e) of the Board's order is, as I view the matter, so broad and sweeping in its terms that it should be eliminated. It is difficult to conceive any character of unfair labor practice denounced by the Act which would not come within the general prohibition of this section. It includes acts wholly unrelated to the charge and findings of the Board. Furthermore, other paragraphs of the order cover the acts complained of, as well as those closely related thereto.