MUELLER BRASS COMPANY, a subsidiary of U. V. Industries, Inc., Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS BOARD et al., Respondents-Cross Petitioners.

No. 75–3761.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1977.

Rehearing and Rehearing En Banc Denied Feb. 24, 1977.

M. Curtiss McKee, Emile C. Ott, Jackson, Miss., for petitioner.

Paul J. Spielberg, Atty., David Zorensky, Atty., John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., Geo. C. Longshore, Birmingham, Ala., for respondent.

Chas. M. Paschal, Jr., Director, Region 15, New Orleans, La., Raymond A. Jacobson, Director, Region 26, N.L.R.B., Memphis, Tenn., for other interested parties.

Before COLEMAN, GODBOLD and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

This case is before the court upon the petition of Mueller Brass Co. (the "Company") for review of, and upon cross-application for enforcement of, an order of the National Labor Relations Board (the "Board"). The issues presented are whether substantial evidence on the record as a whole supports the Board's findings that the Company violated Sections 8(a)(1) and (3) of the National Labor Relations Act (the "Act"), 29 U.S.C.A. §§ 158(a)(1) and (3), by discharging employees Hansford Stone and James Roy Rogers and that the Company violated Section 8(a)(1) of the Act by threatening employees with adverse consequences if the union [1] won the election; intimidating and warning employees against wearing union insignia; questioning employees as to whether anyone had

1. United Steelworkers of America, AFL–CIO–CLC.

talked to them about the union or had tried to get them to sign cards; and asking employees why they were wearing union buttons. Failing to find such evidence, we deny enforcement.

 The appropriate standard of review in this case is clear. We are to sustain the Board's determinations if they are supported by substantial evidence on the record considered as a whole. 29 U.S.C.A. § 160(e); *NLRB v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *International Organization of Masters, Mates and Pilots v. NLRB*, 539 F.2d 554 (5th Cir. 1976). It is not our function to overturn the Board's choice between two equally plausible inferences from the facts if the choice is reasonable, even though we might reach a contrary result if deciding the case *de novo*. *NLRB v. United Insurance Co.*, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); *NLRB v. Mueller Brass Co.*, 501 F.2d 680, 683–684 (5th Cir. 1974); *NLRB v. Standard Forge & Axle Co.*, 420 F.2d 508 (5th Cir. 1969), *cert. denied*, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140 (1970). However, even though our scope of review is thus limited, we should deny enforcement if, after a full review of the record, we are unable *conscientiously* to conclude that the evidence supporting the Board's determinations is substantial.[2] *Universal Camera Corp. v. NLRB, supra; NLRB v. Mueller Brass Co.*, 509 F.2d 704, 707 (5th Cir. 1975); *NLRB v. O. A. Fuller Super Markets, Inc.*, 374 F.2d 197, 200 (5th Cir. 1967).

*Background*

The Company began production in 1971 in Fulton, Mississippi. The union conducted unsuccessful organizing campaigns in 1971 and 1973, and began its third campaign in early 1974. In *NLRB v. Mueller Brass Co.*, 501 F.2d 680 (5th Cir. 1974), this Court upheld the Board's findings that the Company violated §§ 8(a)(1) and (3) of the Act by discharging an employee, and by making threats and suggesting that union organizers were being blacklisted by employees in the area. Significantly, this court found that "[t]here is no question from the record that the Company was strongly anti-union." *Id.* at 685.

Later, in *NLRB v. Mueller Brass Co.*, 509 F.2d 704 (5th Cir. 1975), this court refused to enforce orders of the Board. This court found that "even considered against the Company's prior antiunion sentiment," the unrefuted testimony did not constitute substantial evidence that the Company had created an impression of surveillance. In addition, this Court upheld the suspension of an employee[3] involved in the case *sub judice*, finding no substantial evidence to indicate that the Company had treated him differently from other employees who falsified a report in violation of Company rules. With this background, we proceed to the case at bar.

DISCHARGES

Hansford Stone, Jr. went to work for the Company in March, 1972. Stone was given a verbal warning about absenteeism in February, 1974, and he received a written warning in April, 1974. Stone was specifically informed and warned about an automatic termination under Plant Rule 40.[4]

On April 25, 1974, Stone went to see his physician, Dr. Collum, who advised him that he should go to the hospital. Stone reported this to the Company and Glenn Grissom, the personnel representative, placed him on sick leave. Grissom advised Stone that he should contact the Company when he was

---

**2.** It is important to bear in mind that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. at 488, 71 S.Ct. at 464. *See also Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 234 n. 2, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

**3.** James Roy Rogers.

**4.** Company Rule 40 of the 1974 rules provided:

An employee who is absent for three consecutive working days without permission will be considered a voluntary quit.

able to return to work and that he should present his doctor's release at that time.

Stone was hospitalized from April 25 until May 4, but he did not return to work until May 14. He did not contact the Company between the date of his hospital release and the date of his return to work. Charles Henson, the Company's general foreman, received a report that Stone had been seen around town and, upon inquiry, the Company received a note on May 9 from Dr. Collum stating that Stone should have been able to return to work on May 6, 1974. Thus, on May 9, 1974, Stone was terminated pursuant to Plant Rule 40. Subsequently, the Company received an insurance report indicating that Stone had been discharged from the hospital and that no home confinement was required.

Stone presented himself for work on May 14, 1974. He presented a May 13th note from Dr. Collum stating that he should be able to return to work on May 14. Stone was shown Dr. Collum's May 9th note and asked why he did not report to work on May 6. Stone stated that he had contracted a sore throat. He then left and returned the same day with a third note from Dr. Collum attempting to void the preceding two notes. The Company refused to reinstate him.

The Administrative Law Judge (ALJ) found that Stone's unexcused absence from work in combination with his previous record of absenteeism and the report that he had been seen visiting around town were a sufficient basis for the Company's belief that he had deliberately overstayed his excused absence and then prevailed upon his doctor to contradict his earlier reports. Despite the Company's admitted opposition to the union and its knowledge of Stone's sympathies,[5] the ALJ concluded that Stone was terminated for violating the rule about unexcused absences. The Board disagreed and from its review of the record concluded

that the discharge of Stone was motivated by the Company's opposition to the union and its desire to rid itself of a known union adherent.

The conduct of Stone *pales* in comparison to the actions which formed the basis for the discharge of James Roy Rogers. Rogers began his employment with the Company in February, 1972. Prior to his discharge in February, 1974, he worked the 11:00 p. m. to 7:00 a. m. shift at the plant. Rogers had been active in union organization for approximately one and one-half years and was well known as a union activist by Company officials. He was discharged for conduct which was characterized by the Administrative Law Judge as "vulgar and offensive" by "any standard of acceptable conduct."

In summary, on January 31, 1974, during the 5:00 a. m. break Rogers displayed a mechanized artificial male sex organ to a female employee at the plant. The female employee was embarrassed and turned away. The very next night Rogers, on a dare from a fellow employee, approached another female employee and made her an indecent and offensive proposition. She, too, was embarrassed and upset by the remark.

A few days later Frank Robinson, the Company's Industrial Relations Manager, received a report that there had been an incident in the plant the previous week which had upset the female employees. The person responsible for the incident was not identified. The next day Robinson began an inquiry into the matter and after an extensive investigation, Rogers was interviewed and admitted the incidents involved. Rogers was then discharged by the Company for violation of Plant Rule 22.[6]

With regard to the discharge of Rogers, the ALJ felt that, in light of the Company's opposition to the union, its knowledge of Rogers' union sympathies, its prior discrimi-

---

5. In fact, the ALJ had previously concluded that remarks made to Stone by Company officials violated Section 8(a)(1) of the Act. *See infra.*

6. Company Rule 22 provides:

An employee shall not engage in disorderly, immoral, indecent or illegal conduct.

nation against him,[7] and its protracted investigation into his offenses, despite the absence of employee complaints, compared to its investigations into prior offenses toward female employees, the discharge of Rogers for his improper conduct was a pretext for finally getting rid of him. The Board agreed with the ALJ that the discharge of Rogers was pretextual.

In controversies involving employee discharges or suspensions, the motive of the employer is the controlling factor. *NLRB v. Brown*, 380 U.S. at 287, 85 S.Ct. 980. Absent a showing of antiunion motivation, an employer may discharge an employee without running afoul of the fair labor laws for a good reason, a bad reason or no reason at all. *NLRB v. O. A. Fuller Super Markets, Inc., supra.* The mere fact that a specific employee not only breaks a Company rule but also evinces a pro-union sentiment is alone not sufficient to destroy the just cause for his discharge. *NLRB v. Mueller Brass Co.*, 509 F.2d at 711; *see NLRB v. Soft Water Laundry, Inc.*, 346 F.2d 930 (5th Cir. 1965). The essence of discrimination in violation of Section 8(a)(3) of the Act is in treating like cases differently. Finally, the Board must sustain the burden of showing evidence on the record which establishes a reasonable inference of causal connection between the Company's antiunion animus and the employee's discharge.

In the case *sub judice*, the ALJ concluded that the Company's antiunion sentiment played no part in its decision to terminate Hansford Stone. In reversing, the Board overstepped its bounds. As we observed in *NLRB v. McGahey*, 233 F.2d 406, 412–13 (5th Cir. 1956):

> The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness. If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the dis-

charged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but antiunion purpose as the explanation. But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids.

The Board cites two reasons for its decision to reverse the conclusion of the ALJ: the fact that the Company made no effort to contact Stone prior to discharging him and the Company's failure to credit the doctor's final note which attempted to void all previous notes. However unreasonable the Board may consider these actions on the part of the Company, there is no evidence in the record to indicate that the Company had ever conducted its business otherwise. We know of no requirement that it do so. We conclude that there is no substantial evidentiary basis in the record for the finding that the discharge of Stone was discriminatory and in violation of Section 8(a)(3) of the Act.

We are literally shocked by the conclusion of the Board that Rogers was discharged in violation of the Act and that he is entitled to be reinstated. Rogers' admitted conduct and statements were vulgar and offensive by any standard of decency. The Board was of the opinion that, in light of the prevailing mores in the plant and the treatment afforded to prior transgressors of decent moral standards, the termination of

---

7. Rogers' name was prominent in 204 N.L.R.B. 617 (1973), *enforcement granted*, 501 F.2d 680 (5th Cir. 1974), and he was suspended in 208

N.L.R.B. 534 (1974), *enforcement denied*, 509 F.2d 704 (5th Cir. 1975).

Rogers was pretextual. The answer to such an argument lies in *Frosty Morn Meats, Inc. v. NLRB*, 296 F.2d 617, 621 (5th Cir. 1961):

. . . If, however, the misdeeds of the employee are so flagrant that he would almost certainly be fired anyway there is no room for discrimination to play a part. The employee will not have been harmed by the employer's union animus, and neither he nor any others will be discouraged from membership in a union, since all will understand that the employee would have been fired anyway. It must be remembered that the statute prohibits discrimination, and that the focus on dominant motivation is only a test to reveal whether discrimination has occurred. Discrimination consists in treating like cases differently. If an employer fires a union sympathizer or organizer, a finding of discrimination rests on the assumption that in the absence of the union activities he would have treated the employee differently.

When an employee gives his employer as much reason to fire him as Judkins did, by refusing to follow instructions and by giving not only his supervisors but also his fellow employees the impression that he was uncooperative, there is no basis for the conclusion that the employer has treated him differently than he would have treated a non-union employee. As a speculative matter, it may or may not be true that union animus loomed larger in the employer's motivation than Judkins' shortcomings as a worker. But when the evidence of just cause for discharge is as great as it is here, the record as a whole does not support the conclusion that the discharged employee was deprived of any right because of union activities. The power of reinstatement is remedial. It is not punitive. It is not to penalize an employer for anti-unionism by forcing on the pay-roll an employee unfit to stay on the job.

Rogers was discharged for good and sufficient cause. Insofar as the Board's order requires reinstatement and back pay for him, enforcement is denied.

### "Threats" to Employees

Bobby Taylor started working for the Company in November, 1973. Foreman Bud Gunter asked him during his thirty day review session if anyone had talked to him about the union or had tried to get him to sign a union card. In addition, during his ninety day probationary review Supervisor Raymond Rose asked him, on seeing his union button,[8] what he had against the Company. The ALJ concluded that these matters were of no concern to supervisors and that the question tended to intimidate Taylor in violation of Section 8(a)(1) of the Act. The Board agreed.

Foreman Charles Henson and employee Hansford Stone had a conversation about the union in February, 1974. Henson asked Stone what he thought about the union to which Stone said that he did not know. Henson went on to tell about his sad experience as a union member and of his belief that a union hurt an employee more than it helped. Stone again responded that he did not know, never having been in a union. Henson then pointed out that if there was a strike, the money lost by employees could never be made up. Stone then stated that he did not feel that he was being treated right by the Company to which Henson responded that it was the Company that had given him a job.

The ALJ concluded that Henson's remarks neither promised Stone anything if he rejected the union not threatened him with the loss of any Company benefits if he continued to support the union. The ALJ felt that Henson's attempt to convince Stone that he would gain nothing through the union was protected under Section 8(c) of the Act. The Board did not agree. The Board found that, in light of the Company's open hostility to the union and the pervasive unfair labor practices which it had seen in the record, Henson's remarks were threatening and coercive in violation of Section 8(a)(1) of the Act.

8. The button read, "Vote Yes, United Steelworkers of America, AFL–CIO–CLC."

Finally, on April 18, 1974, Stone had a conversation with Foreman Henson and Foreman Caydo Smith. Intertwined with remarks about Stone's illness and absences, Foreman Smith quipped that perhaps Stone's problem was "rust poisoning." Stone replied that he only knew that he was not being treated right by Manager Robinson to which Smith countered by asserting that the union could hurt more than Manager Robinson. Stone stated that he was going to do what he wanted to do. The ALJ characterized these statements as having "the foreseeable effect of intimidating Stone in the exercise of his right to wear union insignia and to engage in other union activities." The Board accepted this conclusion of the ALJ.

■ After a full review of the record in this case we are unable conscientiously to conclude that the evidence is substantial enough to support a decision that the Company interfered with, restrained, intimidated, threatened or coerced its employees in the exercise of their Section 7 rights. In evaluating whether a Company's conversations with its employees are unlawfully coercive, numerous factors have been identified as relevant: (1) the history of the Company's attitude toward its employees; (2) the type of information sought or related; (3) the rank of the Company official in the Company hierarchy; (4) the place and manner of the conversation; (5) the truthfulness of employees' responses; (6) whether the Company had a valid purpose in obtaining the information; (7) whether the Company communicated this purpose to the employees; and (8) whether the Company assured the employees that no reprisals would be taken. *Florida Steel Corp. v. NLRB*, 529 F.2d 1225, 1229 (5th Cir. 1976); *NLRB v. Varo, Inc.*, 425 F.2d 293 (5th Cir. 1970). Thus, assessed in light of all of the surrounding circumstances, the test is whether the questioning or conversation tends to be coercive. *NLRB v. Varo, Inc., supra.*

■ The conversations in the case at bar occurred during routine encounters between employees and supervisors. There is no evidence to indicate that the Company actively sought out union sympathizers to engage in conversation. In each instance the employees responded candidly and the record does not disclose that anyone was intimidated by the remarks or viewed them as a warning to discontinue support for the union. As a matter of fact, the reverse appears more accurate—the employees reiterated their continued support for the union. The Board places heavy reliance upon the Company's history of antiunionism and the unlawful discharges that it found from the record. We have failed to find substantial support in the record for the conclusion of the Board that the Company unlawfully discharged employees and we likewise fail to find substantial support for the conclusion that the Company violated Section 8(a)(1). Certainly, every remark made by a Company supervisor to employees with whom he has day-to-day working contact about union support or sympathies does not violate the Act. The supervisors' remarks in this case were no more than innocuous questions and isolated statements. *See NLRB v. Fontainebleau Hotel Corp.*, 300 F.2d 662 (5th Cir. 1962); *NLRB v. Hill & Hill Truck Line, Inc.*, 266 F.2d 883 (5th Cir. 1959). Our review of the full record convinces us that they were neither designed to coerce nor did they tend to coerce the employees in the exercise of their rights under the Act. We thus refuse to enforce the Board's order in this respect also.

Enforcement denied.

GODBOLD, Circuit Judge (dissenting):

The majority opinion departs from our proper role in reviewing NLRB orders and from the standards that guide us in this role.

### (1) The discharge of Stone

The majority opinion is neither more nor less than a retrial of this aspect of the case.

Stone had a prior record of absenteeism and was warned about it. From April 25 to May 4 he was hospitalized. He did not report for work, and the company was told

that he was being seen around town. Thereafter it received three notes from Stone's doctor. The first note, received May 9, stated that Stone should have been able to return to work May 6. That same day the company terminated him without discussion or notice, pursuant to a plant rule that one absent for three consecutive working days without permission would be considered a voluntary quit.

Stone showed up for work May 14 bringing the second note from his doctor, dated May 13. It said that he should be able to return to work May 14. Stone was not permitted to go to work, and he left the plant. The company then called the doctor and asked him what the May 13 note meant, and the doctor said that it referred to a sore throat that Stone had contracted. An hour later the doctor called back and asked the company to accept the May 13 note as a release for Stone's return to work and to destroy the May 9 note. Later the same day, May 14, Stone came back with the third note, in which the doctor said that he probably told Stone to take a week off after leaving the hospital on May 4, because of his back problems, but that he was well enough to work as of May 14, that all previous statements made by the doctor were "null and void" and no other notes would be forthcoming.

The ALJ drew from these events an inference that Stone had used his excused absence for sickness as an excuse to stay out after May 6 and had prevailed on the doctor to contradict his earlier reports. That was a permissible inference. The Board, however, drew a different inference. It noted the following elements of proof: (1) The company was hostile to the union and previously had been before the NLRB for commission of unfair labor practices. (2) The company knew of Stone's union sentiment and had actively sought to dissuade him from his union adherence. (3) The company made no effort to contact Stone to determine his condition. (4) On May 9, after determining Stone's release date from the hospital, the company summarily terminated him and gave him no

notice that he had been terminated. (5) The company admitted it had no reason to doubt the authenticity of the third note from the doctor. From all of the evidence the Board drew inferences that the third note dissipated the suspicion that Stone had been malingering, and that the discharge was pretextual. Certainly it was entitled to draw these inferences from the evidence before it.

Language quoted by Judge Hill from *NLRB v. McGahey*, 233 F.2d 406 (C.A.5, 1956), does not change the standard of review that this court has followed in innumerable cases. Further on in the opinion the court specifically noted that:

> In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one.

*Id.* at 413. *McGahey* teaches us that reasonableness, or lack of it, may be circumstantial evidence of the employer's motive in a discharge case, but the Board's view of employer action is not to be treated as talismanic. In the present case the Board did not consider the employer's action in the context of reasonableness or unreasonableness. It accepted the third note as credible, found it was sufficient to dissipate the charge of malingering, and pointed out that the company admitted there was no reason to doubt the authenticity of the note. On this evidence the Board concluded that the discharge was pretextual. Similarly, if introduced, evidence that the company was not acting in accordance with its usual practices would have been part of the overall evidence to be considered. But it is quite different to hold that evidence of motive is insubstantial unless it includes evidence of behavior inconsistent with usual practices.

This is a substantial evidence case. The record fully supports the Board's inference of improper motive.

### (2) The discharge of Rogers

This is a plain, everyday substantial evidence case except for two factors. First,

the status of Rogers as a target for company action is recorded in two previous decisions of this court. Second, Rogers' conduct, which the Board found was the asserted basis for a pretextual discharge, was sexually oriented.[1]

In *Mueller I, NLRB v. Mueller Brass Co.,* 501 F.2d 680 (C.A.5, 1974), we enforced a Board order finding Mueller guilty of § 8(a)(3) discharges and § 8(a)(1) coercion. One of the targets of the coercive company statements was Rogers. 501 F.2d at 686. In that same case the ALJ made this finding with respect to Rogers:

> . . . respondent's industrial relations manager, Gregory, told an employee in September 1972, that Rogers' name was on the desk of every employer in the area as a "union pusher" and that, if he lost his job with respondent, he would be unable to get another in that area.

This was quoted and relied upon in *Mueller II,* discussed below. See 509 F.2d at 708 n.5.[2] In *Mueller II, NLRB v. Mueller Brass Co.,* 509 F.2d 704 (C.A.5, 1975), we declined to enforce a Board order making Rogers whole for a three-day suspension for falsifying excesses for absenteeism because there was no substantial evidence that he was treated differently than others committing like offenses. In the present case, *Mueller III,* the Board properly considered this background in reaching its conclusions that the discharge was pretextual.

I turn now to the factor strongly emphasized by the majority, the sexual content of Rogers' actions. The Board found that what Rogers did was not out of keeping with the general level of conduct in the plant, where bawdy sexual horseplay was commonplace, accepted, and not the subject of discipline. The evidence fully supports the Board's finding. Pornographic pictures were passed around by employees and pornographic books left in accessible places for employees and supervisors to examine. The use of strong language, including four-letter words, dirty jokes and suggestive remarks was common among employees and supervisors. One witness told of means in the plant to order films, plainly referring to pornographic films. The general foreman on Rogers' 11 p. m. to 7 a. m. shift freely exchanged sex jokes with female employees and joined in the general appreciation of pornographic material which turned up around the plant. There is testimony that in one incident he invited two women to examine a book with pictures of men and women having intercourse and approved their suggestion that they take it into the ladies' room to look at it even though neither was scheduled for a break. This foreman was present when Rogers had the artificial sex organ, saw it and laughed at it, and did not say or do anything about its presence. The industrial relations manager of the plant was present, saw the organ and laughed at it. Another foreman saw it later the same evening and "just died laughing." Rogers displayed the device to a group of male and female employees. Only one gave any indication of offense. The rest laughed at it.

Of equal, if not greater significance, is the evidence of other specific incidents of sexually oriented evidence that did not subject the participants to discipline. Rule 22 was given as the basis for Rogers' discharge: "An employee shall not engage in disorderly, immoral, indecent or illegal conduct." No one other than Rogers has ever been discharged for violation of this rule. I have already described the conduct of Rogers' foreman and the industrial relations

---

1. "In view of Respondent's opposition to the Union, its knowledge of Rogers' union sympathies, its prior discrimination against him, and the protracted investigation into Rogers' two offenses, despite the absence of any employee complaints, as compared with its complacency over complaints by women employees in similar situations, I am satisfied that Respondent relied on Rogers' improper conduct as a pretext for finally getting rid of him. I therefore find that Respondent violated Section 8(a)(3) in discharging Rogers." Appendix p. 359.

2. Additionally, in *Mueller I,* this court found that there was "no question from the record that the Company was strongly antiunion." 501 F.2d at 685.

manager with respect to the very circumstances which cost Rogers his job. Also there is evidence of three specific incidents of sexually oriented conduct by male employees toward female employees. With respect to one incident, the husband and the father of the female victim complained to the plant manager and he promised to take action. There is no evidence that any action was ever taken, and the supervisor who was the alleged culprit was later promoted. More than a year later the female employee asked about the matter and was told that she ought to drop it since her complaint was so old.

In two other incidents female employees complained of offensive, sexually oriented remarks made to them by male employees. One of these occurred just a week before the hearing in this case. The male employees were not disciplined.

The majority incorrectly rely on *Frosty Morn Meats, Inc. v. NLRB*, 296 F.2d 617 (C.A.5, 1961). In that case there was uncontradicted testimony from several co-workers, including some who had signed union cards, that employee Judkins was a slow, uncooperative and dangerous worker who performed his duties in a manner that endangered his fellow employees. The trial examiner balanced this against evidence of company animus and of a specific threat to fire Judkins, and concluded that the discharge was pretextual. This court refused to enforce. As Judge Wisdom noted in *Frosty Morn*, and this court reiterated in *Mueller II*, "Discrimination consists in treating like cases differently." In *Frosty Morn*, there was no evidence that like cases were treated differently. In the present case, all the evidence points to the fact that of the "like cases"—Rogers' and all others—only Rogers was singled out for discipline. And the discipline inflicted was the harshest available. This uncontroverted evidence of disparate treatment acquires even greater force when laid against the strong antiunion bias specifically manifested in the past by threats directed at Rogers. 509 F.2d at 708 n.5.

I turn to some of the cases concerning coarse, abusive and profane conduct. In *Mueller I* we enforced an order reinstating employee Blanton who verbally abused a supervisor, accused him of being a "damn liar," and invited him to fight. We relied on the grounds that the incident was provoked by the employer and that "[e]xpression of his [Blanton's] anger in the language of the mill" was "not nearly as shocking" as the employer suggested. In *Brewers and Maltsters Local Union No. 6 v. NLRB*, 301 F.2d 216 (C.A.8, 1962), the company was charged with discharging at the union's request an employee who was "obnoxious, foul-mouthed and profane, prone to apply vile and indecent descriptions to others and one with a propensity for arguing and complaining . . . disliked generally, tolerated by a few, frustrated (etc.)." However the Board found that:

> Profanity, vile name calling, including "muff diving fink" and manners ordinarily frowned upon in most instances, were a form of kidding or joshing in the beer-fumed atmosphere of the working fraternity to which he belonged and seemingly so regarded by the workers, the Union and the management, with physical assault, rather than disciplinary measures, used as the only deterrent, when uncouth habits and conducts of an employee violated standards of accepted tolerances.

301 F.2d at 220 (footnotes omitted). The Eighth Circuit enforced the Board's reinstatement order, pointing out that the choice between either of two permissible inferences was for the Board, not the court. This court, in *NLRB v. Georgia Rug Mill*, 308 F.2d 89 (C.A.5, 1962), enforced the Board order directing reinstatement by an antiunion employer of a union adherent who had replied with obscenities to a supervisor's questioning him concerning unauthorized absence. In *NLRB v. Princeton Inn Co.*, 424 F.2d 264 (C.A.3, 1970), the Board found that a union adherent's foul and abusive language toward a female employee was pretext for discharge, considered against his prior usage of similar language without warning, and the employ-

er's background of antiunion bias, and the fact that a supervisor present did not admonish the employee. The court enforced. The union adherent in *NLRB v. Reynolds Wire Co.,* 121 F.2d 627 (C.A.7, 1941), was fired on the alleged ground that he had scribbled on the newly painted door of the toilet an obscene remark describing the paint job. It was characteristic for employees to scribble indecent remarks on toilet walls and doors. The company had requested that employees refrain from doing this, but it had never fired anyone for doing it or indicated that it would be grounds for discharge. The Board's reinstatement order was enforced.

There are, of course, many cases in which employees have been fired for obscene language or conduct, and the discharges have been held not to violate the Act. The key to understanding is that the drawing of permissible inferences from consideration of what the employee did and said, the mores of the work place, the employee's union adherence, and the antiunion bias of the employer, is the province of the Board, not to be undone by judges. In this instance, the Board was entitled to conclude that, although Rogers' conduct was "bad" in the sense that it was coarse and vulgar, he would not have been discharged in the absence of antiunion bias. It then becomes our duty to enforce. We do not sit as monitors of the level of sexual horseplay permitted in industrial plants or as censors of conduct by a worker which from an Olympian level we think distasteful. Nor do we have any business substituting our judgments of good taste for the experience and expertise of the Board in day-to-day matters of industrial life.

### (3) The 8(a)(1) violations

#### (a) Bobby Taylor

This case is not even close. During a "30-day probationary review" of Taylor's work performance Foreman Gunter asked him if anyone had talked to him about the union or had tried to get him to sign a union card. Gunter told Taylor that the company felt that the employees did not need a union and that it would do anything legally to keep a union out. Two months later, during a "90-day probationary review," Foreman Rose saw that Taylor was wearing a union button and asked him what he had against the company.

The Board could infer that these pointed questions, asked by foremen, in meetings at which Taylor's future with the company was at stake, and against the background of the company's open hostility to the union and other unfair labor practices, past and present, tended to be coercive. *NLRB v. Standard Forge and Axle Company,* 420 F.2d 508 (C.A.5, 1969), *cert. denied,* 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140 (1970); *NLRB v. Camco, Inc.,* 340 F.2d 803 (C.A.5), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965); *NLRB v. American Mfg. Co., Inc.,* 132 F.2d 740 (C.A.5), *cert. denied,* 319 U.S. 743, 63 S.Ct. 1030, 87 L.Ed. 1700 (1943).

#### (b) Hansford Stone

The questions and statements made by the foreman to Stone were marginal. However, in light of the company's open hostility, the statement to Stone that he was suffering from "rust poison" tended to restrain him in the exercise of his right to wear union insignia.