563 F.2d 1252
 96 L.R.R.M. (BNA) 3383, 82 Lab.Cas. P 10,218,
2 Fed. R. Evid. Serv. 1186
 STURGIS NEWPORT BUSINESS FORMS, INC., a Division of Litton
Business Systems, Inc., Petitioner-Cross Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.
 No. 77-1281.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 1, 1977.
 
 M. J. Diederich, Beverly Hills, Cal., for petitioner-cross respondent.
 Elliott Moore, Deputy Assoc. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Robert Sewell, Supervisor, N. L. R. B., Washington, D. C., for N. L. R. B.
 Reg. Dir., Reg. 26, Clifford Davis, Memphis, Tenn., for other interested parties.
 Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board. (Georgia Case)
 Before WISDOM, GEWIN, and AINSWORTH, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 The National Labor Relations Board found that the petitioner, Sturgis Newport Business Forms, Inc., violated Section 8(a)(1) of the National Labor Relations Act[1] eleven times during a campaign to organize its Corinth, Mississippi plant. We find that substantial evidence on the record as a whole supports the findings. Accordingly, we enforce the Board's order.
 
 I.
 
 2
 Sturgis Newport Business Forms, Inc. is a Division of Litton Business Systems, Inc., a Subsidiary of Litton Industries, Inc. The Company prints, sells, and distributes business forms. It operates plants in Michigan, Wisconsin, and Virginia and has its corporate offices in Fitchburg, Massachusetts. Until late September 1975 it also operated a plant in Corinth, Mississippi, where the alleged violations of Section 8(a)(1) occurred. The plant employed forty-six workers, three supervisors and two managers.
 
 
 3
 The Corinth plant was not successful. In an effort to increase its profitability, the Company changed the management and certain operating procedures at the plant. Apparently, the employees objected to some of the changes. In 1975, several of them became interested in obtaining union representation. They sought assistance from union organizer Dale Fortenberry. Fortenberry met with Corinth employees several times beginning May 11. By May 27, the Union[2] had obtained valid authorization cards from 25 of the 46 production, maintenance, and shipping employees. By May 29, three more employees had signed cards.
 
 
 4
 On May 27, Fortenberry wrote to Mr. Gene Crawford, the general manager of the Corinth plant, to request recognition, offering to submit the authorization cards to a third party for inspection. The letter advised Crawford that the Union would petition for a Board election, if the Company did not recognize it. Crawford refused to recognize the Union in a letter dated May 30. On June 3 he sent a letter to all employees setting forth the Company's opposition to unionization.
 
 
 5
 The Board directed an election on July 7, 1975. It was never held. The financial losses at Corinth continued and in September 1975, Sturgis Newport decided to close the plant.[3] There is no evidence that the Company plans to reopen the Corinth plant.[4]
 
 
 6
 The Union filed a charge with the Board on June 30, 1975, alleging violations of Sections 8(a)(1), (3), and (5) of the Act. These charges were amended several times. They were consolidated for hearing with an amended charge of another 8(a)(5) violation filed later. The Administrative Law Judge dismissed the 8(a)(3) and (5) charges. He found eight violations of 8(a)(1). The ALJ issued a cease and desist order. Since the plant had closed, however, and there was no evidence that the unfair labor practices had affected the remaining Company operations, the ALJ found no reason to post a notice.[5]
 
 
 7
 The Board accepted the dismissal of the 8(a)(3) and (5) charges. It affirmed the eight 8(a)(1) findings and, based on its reading of the record, added three more. In addition to issuing a cease and desist order, the Board ordered the Company to mail a notice to each person employed at its Corinth plant on May 29, 1975.[6]
 
 
 8
 The Board based its conclusions on evidence of one incident when employees spotted a supervisor driving by a union meeting and ten conversations between supervisors and employees during the organization campaign. The ten conversations all took place in work or rest areas. The participants worked together and, in some cases, the supervisor and the employee were old friends. Each conversation involved only one or two employees.
 
 
 9
 Supervisor John Dunning initiated two conversations. After the May 11 meeting, Dunning asked employee Morris Simms if Simms had been at "the meeting". When Simms replied, "what meeting?", Dunning said, "I know you was there". Dunning also asked employee Mike Knight if Knight had attended the first union meeting. Knight responded that he had; Dunning then asked how many employees had attended. Knight told him that there had been a "pretty good size" crowd.
 
 
 10
 Two conversations involved supervisor George Dangler. Both took place on the Company loading dock. Employees Ronald Castile and Gary Marolt were waiting on the dock one morning when Dangler arrived. Castile put a card promoting a candidate for sheriff in Dangler's pocket and said "George, are you going to vote?". Dangler, who did not know the subject of the card, replied, "Boys, I hope you don't do anything to jeopardize the plant or your jobs". Several weeks later, Simms asked Dangler what he thought the Company would do if the employees unionized. Dangler replied that his personal feeling was that the Company would "just lock the doors".
 
 
 11
 Supervisor Marcus Brewster participated in the other conversations. Although the Company instructed Brewster not to ask directly about the union, the ALJ believed that Brewster utilized the device of starting conversations with employees, asking if there was anything new or anything wrong, to draw them into a conversation about the union.[7] About a week after the May 11 meeting, Brewster asked Castile "what the problem was?". Castile asked what he meant and the two then speculated on the Union's strength. Brewster guessed 30 to 40 percent; Castile, closer to 80 or 90 percent.
 
 
 12
 After an unpopular plant manager had been discharged, Brewster asked employee John Smith if the change satisfied him. Smith responded that he would do everything he could to help organize the plant. Brewster told him he hoped he "would think about it some and maybe change (his) mind about it". Brewster spoke twice with Teddy Wigginton, another employee he supervised. The first time, he suggested that Wigginton talk some sense into Smith about the Union. Wigginton responded that he supported the Union himself. The second time, Brewster began the conversation by asking Wigginton what was going on, and, after the subject of the Union had come up, advised Wigginton to "do whatever is best for your family".
 
 
 13
 Brewster and employee Edward Hohn had many conversations about the Union. During one, Brewster asked if Hester Rickman, another employee, had been at a Union meeting the evening before. After Hohn replied that he did not know, Brewster asked how many pressmen attended. Hohn said all of them; Brewster commented that he had heard two or three did not. Brewster also told Hohn that if the employees organized "the plant would probably close its doors".
 
 
 14
 The employee Brewster had inquired about was later laid off. Brewster told Rickman that he had heard from another employee, who had once supervised Rickman, that Rickman was being laid off because she supported the Union.
 
 
 15
 On another occasion, employee Claude Hinton asked Brewster what a stranger was doing around the plant. Brewster explained that he was in labor relations and had come to study complaints about the plant. Hinton agreed that the employees were dissatisfied. Brewster then told Hinton that he should do the best thing for himself and his family. Brewster also said that the last dealings he had with a union were at a hosiery mill and that he lost his job over it.
 
 
 16
 The final 8(a)(1) charge is surveillance of a union meeting. The Union held a meeting on June 8, 1975, at a local motel. After the meeting several employees were standing in the parking lot when they saw Office Manager Nathan Coates in his car, looking in their direction. They testified that he drove by, turned around, passed the motel again and then followed Fortenberry to Fortenberry's home 12 miles out of town. Coates said he did not turn around. He admitted, however, that he followed Fortenberry home.
 
 II.
 
 17
 The Board's determinations must be sustained if they are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Mueller Brass Co. v. N.L.R.B., 5 Cir. 1977, 544 F.2d 815. Moreover, we must recognize the Board's expertise in labor relations law. If the Board has made a plausible inference from the evidence, we do not overturn its findings even if we might reach a contrary result in deciding the case de novo. N.L.R.B. v. United Insurance Co., 1968, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083; Mueller Brass Co. v. N.L.R.B., 544 F.2d at 817.
 
 
 18
 The petitioner's brief points out that the employees at the Corinth plant were not, in fact, coerced by any of the conversations or the surveillance. This is beside the point; the test for an 8(a)(1) violation is whether questions, threats or surveillances tend to be coercive, not whether the employees are in fact coerced. N.L.R.B. v. Huntsville Mfg. Co., 5 Cir. 1975, 514 F.2d 723, 724; N.L.R.B. v. Camco, Inc., 5 Cir. 1965, 340 F.2d 803, 804 n.6; N.L.R.B. v. American Mfg. Co., 5 Cir. 1943, 132 F.2d 740.
 
 
 19
 Among the factors frequently identified as relevant in an evaluation of the tendency of conversations to be coercive are (1) the history of the Company's attitude toward its employees; (2) the type of information sought or related; (3) the rank of the Company official in the Company hierarchy; (4) the place and manner of the conversations; (5) the truthfulness of employees' responses; (6) whether the Company has a valid purpose in obtaining information; (7) if so, whether this purpose is communicated to employees; and (8) whether the Company assures employees that no reprisals will be taken if they support the Union. Mueller Brass Co. v. N.L.R.B., 544 F.2d at 821; Florida Steel Corp. v. N.L.R.B., 5 Cir. 1976, 529 F.2d 1225, 1229; N.L.R.B. v. Varo, Inc., 5 Cir. 1970, 425 F.2d 293; N.L.R.B. v. Camco, Inc., 340 F.2d at 803.
 
 
 20
 This list is not exhaustive. Moreover, a proper evaluation of the evidence goes beyond examining a list of factors and then comparing the number that favor the employer to the number that favor the union. Intimidation may occur even if all factors cut in favor of the employer. N.L.R.B. v. Camco, Inc., 340 F.2d at 803; Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L.Rev. 38, 106-07.[8] And the factors do not all cut in favor of the employer in this case. The Company has shown no reason for questioning employees. It certainly did not communicate any reason to the workers. Several of the employees gave evasive answers when questioned, raising the inference they feared reprisal. Company supervisors made no effort to assure employees with whom they talked that there would be no reprisals. Indeed, that the Company laid off Rickman after Brewster asked whether she attended a Union meeting would suggest the opposite.
 
 
 21
 The repeated efforts to determine who was supporting the Union and to suggest dire consequences should the employees organize must be considered against a background of Company opposition to the Union. Such opposition is not proof of anti-union animus, and, as the petitioner points out, employers are entitled to oppose unionization. Nevertheless, such opposition may be considered as background when determining whether conversations tend to be coercive. See N.L.R.B. v. Birdsall Construction Co., 5 Cir. 1973, 487 F.2d 288, 291.
 
 
 22
 Other circumstances support the Board's conclusions. The combination of questions about the identity of union supporters and threats of a plant closing has greater coercive potential than either type of conversation alone. All three supervisors participated in conversations about the Union. They spoke with 8 of 46 employees, about one of every six of the work force. Furthermore, the supervisors could expect employee discussions of their remarks to extend the impact of their statements to other workers. The employees involved in the conversations included some of the most active supporters of the Union. All had signed Union authorization cards. Smith, Castile, and Marolt solicited authorization cards from other employees.
 
 
 23
 Despite all this, the petitioner cites as controlling Mueller Brass Co. v. N.L.R.B., N.L.R.B. v. Huntsville Mfg. Co., and Utrad Corporation v. N.L.R.B., 7 Cir. 1971, 454 F.2d 520. All three are distinguishable.
 
 
 24
 In Utrad, immediate supervisors questioned 3 employees of 455. The conversations were casual and friendly, taking place in work areas. The Court found that no employee could reasonably believe that the supervisors were speaking for the Company. The Court also dismissed a single comment that the plant might close as an isolated remark and, in the circumstances not coercive.
 
 
 25
 In Huntsville the conversations complained of involved only 10 of 1,000 employees. The Court characterized as innocuous the questions put to employees by their immediate supervisors in work or break areas. The supervisors were low level, no anti-union animus had been shown and the employees answered the questions without evasion. The Court disagreed with the Board's finding that a factually accurate reference to a post-unionization plant closing twenty years before carried the threat of reprisal. Finally, the Court was bothered because the ALJ had shifted the burden to the Company to show that questioning was not widespread.
 
 
 26
 In Mueller Brass, the Company questioned only two of approximately 350[9] workers.[10] A foreman asked one probationary employee who was wearing a union button what he had against the company. The other employee was twice told by foremen that the union would be bad for the company and, once when he was ill, was asked if he was suffering from "rust poisoning". The Court emphasized that the encounters were routine and the statements were isolated and innocuous. The Court also pointed out that there was no evidence the Company sought out union sympathizers for questioning and that the employees had been candid in their responses to the foremen.
 
 
 27
 The Mueller Brass, Huntsville, and Utrad Courts could characterize company questioning as isolated and non-coercive because so few employees were involved. We are unable to do so when the conversations include 8 of 46 workers, a much higher percentage of the total work force. Such pervasive questioning has much more significance and potential for coercion.
 
 
 28
 Nor do numbers supply the only distinction between this case and Mueller Brass, Huntsville, or Utrad. Here, there was evidence to support a Board inference that union sympathizers were special targets of questioning. Some of the answers to the supervisors' questions were evasive. The incidents leading to Richman's dismissal carried a substantial threat of reprisal for union activities. The threats of plant closing if the Union won were more explicit. For these reasons, the three cases do not carry the weight the Company would give them.
 
 
 29
 The petitioner also relies upon Section 8(c) of the Act.[11] Such reliance begs the question. By its own terms, Section 8(c) applies only if an expression "contains no threat of reprisal or force or promise of benefit". In other words, the applicability of 8(c)'s protection turns on the same question we have just considered. Our finding that the Company supervisors' actions had a tendency to coerce the Corinth employees means that the Company can find no comfort in Section 8(c). See N.L.R.B. v. Gissel Packing Co., 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547; N.L.R.B. v. Kaiser Agricultural Chemicals, 5 Cir. 1973, 473 F.2d 374; Jacksonville Paper Co. v. N.L.R.B., 5 Cir. 1943, 137 F.2d 148, cert. denied, 320 U.S. 772, 64 S.Ct. 84, 88 L.Ed. 462.
 
 III.
 
 30
 At the beginning of the hearing before the ALJ, the Company moved to sequester the witnesses under Federal Rule of Evidence 615.[12] The ALJ granted the motion. In accordance with past Board practice, however, he exempted from sequestration witnesses who were alleged discriminatees. Since every witness called by the General Counsel was an alleged discriminatee, the sequestration order had no practical effect.
 
 
 31
 The petitioner contends that the failure to sequester witnesses resulted in prejudice on the surveillance charge. Because the General Counsel witnesses listened to each other testify, the petitioner argues, they were able to tell identical stories. As a result, the petitioner claims, the ALJ credited the employees' version of the incident rather than that of Office Manager Coates.
 
 
 32
 Section 10(b) of the Act requires hearings before an ALJ to be conducted, so far as practicable, in accordance with the rules of evidence used in the federal district courts. Those rules include Rule 615. The Company contends first, that the General Counsel witnesses did not fall within an exception to Rule 615 and, second, that Rule 615 therefore mandates that they be sequestered at the request of a party. The Board responds that the ALJ had discretion to exempt discriminatees from the Rule.
 
 
 33
 We note the persuasive analysis of this question in N.L.R.B. v. Stark, 2 Cir. 1975, 525 F.2d 422, cert. denied, 1976, 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734. In that case Judge Friendly concluded that the failure to sequester discriminatees is presumably an abuse of discretion. That presumption can "be rebutted, if at all, only by a particularized showing of need for the discriminatees to hear each other's evidence a showing we find extremely hard to visualize". 525 F.2d at 430.
 
 
 34
 It is unnecessary, however, for us to take a firm stand on the proper way to apply Rule 615 in Board proceedings. Even if the Rule was misapplied in this case, there was no prejudice to the petitioner. See Ayres & Co. v. N.L.R.B., 4 Cir. 1977, 551 F.2d 586; N.L.R.B. v. Stark, 525 F.2d at 431. The only significant factual discrepancy between the two versions of the surveillance incident is whether Coates turned around and passed the motel a second time before following Fortenberry for 12 miles. That Coates passed the meeting even once and then followed the Union organizer twelve miles supports the Board's finding of surveillance. Coates did offer an explanation of the incident which, if credited, would have undermined the Board's conclusion. The ALJ, however, discredited Coates' explanation for reasons unrelated to the factual discrepancy or the similarity of the employees' testimony.[13]
 
 IV.
 
 35
 Finally, the petitioner challenges the Board's order that it mail a notice to each person employed at its Corinth plant on May 29, 1975. We agree with the Company that little purpose will be served by these notices since the Company has closed the plant and represents that it has no intention to reopen the plant. But this company has other plants. Such notices are prophylactic and in keeping with the objectives of the Act. Moreover, a remedy of this character is particularly within the expertise of the Board, which has broad discretion to frame affirmative orders to remedy unfair labor practices. See Fibreboard Paper Products Corp. v. N.L.R.B., 1964, 379 U.S. 203, 217, 85 S.Ct. 398, 13 L.Ed.2d 233; Stevens & Co. v. N.L.R.B., 5 Cir. 1969, 417 F.2d 533, 537-38. Here, where the Company's closing of the plant precluded notification through posting, the Board did not abuse that discretion when it ordered the mailing.
 
 
 36
 ENFORCED.
 
 
 
 [1]
 29 U.S.C.A. § 158(a)(1) (1970)
 
 
 [2]
 International Association of Machinists and Aerospace Workers, AFL-CIO
 
 
 [3]
 Company counsel sent a telegram to the union on September 29, 1975 advising that economic conditions had forced closure of the Corinth plant, and asking for a reply by October 1 "If you wish to discuss this matter". The union received the telegram on October 1. Union representative H. C. Summers, who had replaced the original union organizer, attempted to reach counsel by phone and then wrote a letter requesting that the plant remain open pending negotiation on the closing and its effects. The company responded on October 10. It offered to meet with Summers if the union could show how the company could reverse losses at Corinth and produce a profit of 10 percent of gross sales. The union did not respond and the plant closed
 
 
 [4]
 Appendix at 37, Sturgis-Newport Business Forms, Inc. v. NLRB, 5 Cir. 1977, No. 77-1281 (opinion of the ALJ)
 
 
 [5]
 The ALJ's order would have required the company to post a notice if it reopened its Corinth, Mississippi plant
 
 
 [6]
 227 NLRB No. 199
 
 
 [7]
 Appendix at 28 (opinion of the ALJ)
 
 
 [8]
 The petitioner emphasizes that the supervisors were low in the company hierarchy. Although this factor is relevant, it is far from determinative. See NLRB v. Camco, Inc., 340 F.2d at 806-07 (crucial question is not the supervisors' rank but whether to the employees the interrogators represent the Company). In this case, although it is true the supervisors were only one level above the employees, it is also true that they were only one level below the plant managers
 
 
 [9]
 NLRB v. Mueller Brass Co., 5 Cir. 1975, 509 F.2d 704, 707
 
 
 [10]
 Mueller Brass also involved a charge that the Company violated §§ 8(a)(1) and (3) of the Act by discharging two employees for their union activities. 544 F.2d at 817-820. This part of the opinion does not apply to the issue before us
 
 
 [11]
 The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit
 29 U.S.C.A. § 158(c)(1970).
 
 
 [12]
 At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause
 Fed.Rules Evid.Rule 615, 28 U.S.C.A.
 
 
 [13]
 "Coates would have me believe that the whole affair was one coincidence piled on top of another. The coincidences stretch my credulity too far and I do not believe him." Appendix at 34 (opinion of the ALJ)